**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                         )
JUDICIAL WATCH, INC.,                    )
                                         )
                 Plaintiff,              )
                                         )
        v.                               )        Civil Action No. 07-561 (RCL)
                                         )
U.S. FOOD AND DRUG                       )
ADMINISTRATION,                          )
                                         )
                                         )
                 Defendant.              )
_____)

<u>**DEFENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**</u>

Defendant United States Food and Drug Administration, by and through undersigned

counsel, respectfully moves this Court to dismiss plaintiff's amended complaint for lack of

jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendant's release of documents to

plaintiff rendered this case moot, thereby depriving this Court of jurisdiction.  For the same

reason, plaintiff cannot prove any set of facts that would entitle it to relief.  Alternatively,

defendant moves for summary judgment because there are no material issues of fact and

defendant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The grounds for this

motion are set forth in the accompanying memorandum of law.

A statement of material facts not genuinely in dispute and proposed order are also filed herewith.

Dated: July 16, 2007                          Respectfully submitted,


                                              _____/s/_____
                                              JEFFREY A. TAYLOR, D.C. BAR # 498610
                                              United States Attorney


                                              _____/s/_____
                                              RUDOLPH CONTRERAS, D.C. BAR #434122
                                              Assistant United States Attorney


                                              _____/s/ Robin M. Meriweather_____
                                              ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                              Assistant United States Attorney
                                              555 Fourth St., N.W.
                                              Washington, D.C.  20530
                                              Phone: (202) 514-7198
                                              Fax: (202) 514-8780
                                              Robin.Meriweather2@usdoj.gov

**Of Counsel:**

　　Daniel Meron
　　General Counsel

　　Sheldon T. Bradshaw
　　Chief Counsel
　　Food and Drug Division

　　Eric M. Blumberg
　　Deputy Chief Counsel, Litigation

　　Wendy S. Vicente
　　Associate Chief Counsel
　　United States Department of Health and Human Services
　　Office of the General Counsel

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**JUDICIAL WATCH, INC.,**                 )
                                          )
          **Plaintiff,**   )
                                          )
        **v.**                       )     **Civil Action No. 07-561 (RCL)**
                                          )
**U.S. FOOD AND DRUG**                    )
**ADMINISTRATION,**                       )
                                          )
                                          )
          **Defendant.**   )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The Court should dismiss plaintiff's Freedom of Information Act ("FOIA") complaint pursuant to Rule 12(b)(1) or 12(b)(6) because defendant United States Food and Drug Administration ("FDA") has produced all responsive records to plaintiff. This case concerns three FOIA requests in which plaintiff Judicial Watch, Inc. ("Judicial Watch") sought the production of certain records relating to communications between FDA and three Senators (Hillary Rodham Clinton, Patty Murray, and Michael Enzi) concerning ".75 levonorgestrel," which is sold under the name "Plan B." FDA provided plaintiff with all of the requested records on April 6, 2007, and July 10, 2007, and no documents were withheld. See Declaration of Lisa C. Granger dated May 2, 2007, ¶ 5 ("May Granger Decl.") (Exh. A hereto); Declaration of Lisa C. Granger dated July 12, 2007, ¶ 6 ("July Granger Decl.") (Exh. B hereto). Those releases of records eliminated any live controversy between the parties, and rendered the case moot.

To the extent Judicial Watch challenges the adequacy of the search for documents, FDA moves, in the alternative, for summary judgment. A FOIA defendant is entitled to summary

judgment if its search for responsive records was reasonable as a matter of law.  As explained

below and in the attached declarations, FDA conducted a comprehensive search to locate

responsive documents, and provided all responsive documents to plaintiff without any

withholding or redactions.  No genuine issue of fact remains.  Accordingly, the Court should

grant defendant's alternative motion for summary judgment if the Court does not dismiss the

case as moot.

## **FACTUAL BACKGROUND**

The relevant facts are fully set forth in Defendant's Statement of Materials Facts Not In

Genuine Dispute.  However, the following brief summary of the facts provides context for this

motion.

By letter dated August 22, 2006, Christopher J. Farrell of Judicial Watch submitted to

FDA a FOIA request for "any and/or all communication and/or correspondence between the

FDA and Senator Hillary Rodham Clinton, . . . [and/or] any agent and/or representative of

Senator Hillary Rodham Clinton, and/or the Office of Senator Hillary Rodham Clinton regarding

'.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Clinton request") Am. Compl. ¶

5 (Dkt. Entry 24); May Granger Decl. Exh. 1.  On August 24, 2006, FDA sent Judicial Watch a

letter acknowledging receipt of the request.  See Am. Compl. ¶ 6.  Judicial Watch initiated this

FOIA action on March 21, 2007, asking that the Court "order Defendant to search for and

produce by a date certain any and all non-exempt records responsive to Plaintiff's FOIA

request."  Compl. at 3 (Dkt. Entry 1).

On April 6, 2007, FDA sent Judicial Watch the records responsive to the Clinton request.

See May Granger Decl., ¶ 5; id. Exh. 2.  No responsive documents were redacted or withheld.

2

See May Granger Decl., ¶ 5.  FDA was able to release those documents despite its significant

backlog of FOIA requests, because the Judicial Watch request was processed in the track for less

cumbersome requests.  See id. ¶ 6.

FDA filed a motion to dismiss this case on May 4, 2007, or, in the alternative, for

summary judgment.  Following FDA's motion, plaintiff sought to amend its complaint to include

claims relating to two additional FOIA requests.  One of those requests was submitted on April

20, 2007, by Deronda Grothe of Judicial Watch, Inc. ("Judicial Watch"), for "any and/or all

communication and/or correspondence between the FDA and Senator Patty Murray, . . . [and/or]

any agent and/or representative of Senator Patty Murray, and/or the Office of Senator Patty

Murray regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Murray

request").  See July Granger Decl., ¶ 3, id. Exh. A. ("Murray request").  The other request was

submitted on April 23, 2007, also by Deronda Grothe of Judicial Watch, for "any and/or all

communication and/or correspondence between the FDA and Senator Michael Enzi, . . . [and/or]

any agent and/or representative of Senator Michael Enzi, and/or the Office of Senator Michael

Enzi regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Enzi Request").

See July Granger Decl. ¶ 4; id. Exh. B.

On July 6, 2007, this Court granted plaintiff's motion to file its amended complaint, and

denied FDA's motion to dismiss or in the alternative, for summary judgment, "without prejudice

to renewal." (Dkt. Entry 23).  Judicial Watch re-filed its amended complaint on the same day.

(Dkt. Entry 24).  On July 10, 2007, FDA produced all responsive records to plaintiff for the

Murray and Enzi requests.  Accordingly, all three of plaintiff's FOIA requests have been

satisfied by FDA's production of documents.

3

## STANDARD OF REVIEW

### A.     Motion to Dismiss

Defendant moves for dismissal under Rule 12(b)(1), as events subsequent to the

complaint deprived the Court of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  When

reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual

allegations as true and draw all reasonable inferences in the plaintiff's favor."  Thompson v.

Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v.

Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999).  "The court is not required, however, to accept

inferences unsupported by the facts alleged or legal conclusions that are cast as factual

allegations."  Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C.

Cir. 2003).  In addition, plaintiff bears the burden of persuasion, and must establish subject-

matter jurisdiction "by a preponderance of the evidence."  Thompson, 120 F. Supp.2d at 81;

Vanover, 77 F. Supp.2d at 98.  To determine the existence of jurisdiction, a court may look

beyond the allegations of the complaint, consider affidavits and other extrinsic information, and

ultimately weigh the conflicting evidence.  See Herbert v. Nat'l Academy of Sciences, 974 F.2d

192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

Defendant also moves for dismissal under Rule 12(b)(6), because plaintiff fails to state a

claim upon which relief can be granted.  Rule 12(b)(6) requires dismissal if a plaintiff fails to

plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v.

Twombly, 127 S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving

party to show that plaintiff can prove no set of facts in support of its claim which would entitle it

to relief").  The Court must resolve all factual doubts in favor of the plaintiff, and allow the

plaintiff the benefit of all inferences.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

 **B.**  **Summary Judgment**

  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995); Molerio v. FBI, 749 F.2d 815, 823 (D.C. Cir. 1984).  Where no genuine dispute exists as to any material fact, summary judgment is required.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

  A genuine issue of material fact is one that could change the outcome of the litigation. Id. at 247.  The party moving for summary judgment need not prove the absence of an essential element of the nonmoving party's case.  Celotex, 477 U.S. at 325.  "The burden on the moving party may be discharged by 'showing' –  that is, pointing out to the (Court) –  that there is an absence of evidence to support the non-moving party's case."  Id.  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56 requires the party opposing summary judgment to go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Banks v. C & P Tel. Co., 802 F.2d 1416

(D.C. Cir. 1986). To avoid summary judgment, the plaintiff must state specific facts or present some objective evidence that would enable the court to find an entitlement to relief.

Summary judgment is appropriate "if the evidence [the nonmoving party submits] is merely colorable . . . or is not sufficiently probative . . . (T)he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. Neither is unsupported speculation enough to defeat a summary judgment motion; the existence of specific, material evidentiary facts must be shown. See Fed. R. Civ. P. 56(e) (the nonmoving party may not rest on mere allegations but "must come forward with 'specific facts showing there is a genuine issue for trial"); see also Burke v. Gould, 286 F.3d 513, 517-20 (D.C. Cir. 2002) (requiring a showing of specific, material facts); Hayes v. Shalala, 902 F.Supp. 259, 263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere unsupported allegations or denials); Johnson v. Digital Equip. Corp., 836 F.Supp. 14, 18 (D.D.C. 1993) (evidence that is merely colorable or not sufficiently probative is insufficient to defeat summary judgment).

## ARGUMENT

### I.    PLAINTIFF'S FOIA CLAIMS SHOULD BE DISMISSED BECAUSE FDA HAS PROVIDED ALL OF THE REQUESTED RECORDS.

Under Article III, section 2 of the Constitution, federal courts only have jurisdiction to hear and decide actual "cases" or "controversies." Allen v. Wright, 468 U.S. 737, 750 (1984); see National Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997). This requirement prevents the issuance of advisory opinions, as it demands the existence of an actual dispute between adverse parties with a stake in the outcome. See Richardson v. Ramirez, 418 U.S. 24, 36 (1974). In fact, "[n]o principle is more fundamental to the judiciary's proper

8

role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases and controversies." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 37 (1976) (citing Flast v. Cohen, 392 U.S. 83, 95 (1968)).

The case-or-controversy requirement must be met "through all stages of federal judicial proceedings." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). The effect of post-complaint changes in the facts or law on the continued existence of a particular controversy is assessed through the lens of mootness. See Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)). Thus, the controversy must exist at the outset of the litigation and continue throughout the existence of the suit. See Columbian Rope Company v. West, 142 F.3d 1313, 1316 (D.C. Cir. 1998) (citing Arizonans for Official English, 520 U.S. 43). As this Circuit has explained:

> [E]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal Court to refrain from deciding it if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."

Columbian Rope, 142 F.3d at 1316 (quoting Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)). Once a case becomes moot, the court loses jurisdiction. See City of Houston v. Department of Housing and Urban Dev., 24 F.3d 1421, 1426 (D.C. Cir. 1994).

In FOIA cases, the mootness doctrine comes into play when all documents have been released to the requester. The release of documents eliminates any live controversy between the parties because it gives the requester the relief sought in the FOIA complaint. See Crooker v. United States State Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980) ("Once the records are produced [in a FOIA case] the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made."). Such cases are properly dismissed on mootness

grounds because there is no further judicial function for the Court to perform.  See Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987); Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982); Trueblood v. Dep't of Treasury, 943 F. Supp. 64, 67 (D.D.C. 1996).

In this case, the Court lacks subject matter jurisdiction because events subsequent to the filing of the amended complaint have ended any live controversy between the parties.  Judicial Watch's FOIA claims sought to compel FDA to produce the requested records by a date certain. See Am. Compl. ¶¶ 7, 12, 15.  Plaintiff received this relief when FDA sent Judicial Watch all documents responsive to the Clinton request on April 6, 2007, and all documents responsive to the Murray and Enzi requests on July 10, 2007.  See May Granger Decl., ¶ 5; July Granger Decl., ¶ 6.  No withholdings were identified.  See id.  Even assuming arguendo that Judicial Watch had a viable claim at the time the amended complaint was filed, it has now, without the necessity of judicial intervention, received the relief sought.  Therefore, plaintiff's amended complaint should be dismissed as moot.[1]  See Tijerina, 821 F.2d at 799; see also Fed. R. Civ. P. 12(h)(3) ("[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action").

Plaintiff's request for attorney's fees and costs does not prevent application of the mootness doctrine in this case.  To be sure, FDA's release of documents did not satisfy plaintiff's desire for fees and costs.  See Am. Compl. at 4.  However, a party's request for attorney's fees is "collateral to, and separate from" the merits.  Shultz v. Crowley, 802 F.2d 498, 502 (D.C. Cir. 1986).  Accordingly, a fee request does not preserve a case that is otherwise moot.

---

[1]  Defendant's release of all responsive documents also requires dismissal pursuant to Rule 12(b)(6).  To state a claim under the FOIA, plaintiff must show that the agency has improperly withheld agency records.  See 5 U.S.C. § 552(a)(4)(B).  Here, no documents were withheld.  See May Granger Decl., ¶ 5; July Granger Decl., ¶ 6.

Friends of Keeseville, Inc. v. F.E.R.C., 859 F.2d 230, 233 n.7 (D.C. Cir. 1988); American

Council for the Blind v. Washington Metro. AreaTrans. Auth., 133 F. Supp. 2d 66, 72 n.1

(D.D.C. 2001).

In any event, plaintiff is not entitled to fees or costs in this litigation.  "The Court may

assess against the United States reasonable attorney fees and other litigation costs reasonably

incurred in any case under this section [5 U.S.C. § 552] in which the complainant has

substantially prevailed."  5 U.S.C. § 552(a)(4)(E).  Here, plaintiff has not "prevailed" because

the Court has not awarded plaintiff any relief.  See Oil, Chem. & Atomic Workers Int'l Union v.

Dep't of Energy, 288 F.3d 452, 456-57 (D.C. Cir. 2002); see also Buckhannon Bd. & Care

Home, Inc. v. West Va. Dep't of Health and Human Res., 532 U.S. 598, 605 (2001) ("We cannot

agree that the term 'prevailing party' authorizes federal courts to award attorney's fees to a

plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it

will never be determined), has reached the 'sought-after destination' without obtaining any

judicial relief.").  Accordingly, FDA's voluntary release of all responsive documents deprives

plaintiff of any viable claim for fees or costs.

## B.    IN THE ALTERNATIVE, DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE IT CONDUCTED A REASONABLE AND ADEQUATE SEARCH FOR RESPONSIVE RECORDS.

Judicial Watch's failure to voluntarily dismiss its FOIA claims after FDA's release of

records suggests that Judicial Watch may renew its prior challenge to the adequacy of the search

for the Clinton request, and may raise similar challenges to the adequacy of the search for the

Murray and Enzi requests.  However, FDA is entitled to summary judgment because it released

all of the records that it collected after using its best efforts to locate responsive records.  An

agency's summary judgment motion should be granted if the agency shows that it "conduct[ed] a

11

search reasonably calculated to uncover all relevant documents." Kowalczyk v. DOJ, 73 F.3d

386, 388 (D.C. Cir. 1996) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990));

see also Voinche v. FBI, 425 F. Supp. 2d 134, 135 (D.D.C. 2006).  If the plaintiff challenges the

nature and extent of an agency's search for responsive documents, the agency "must demonstrate

beyond material doubt that the search was reasonable.'" Kowalczyk, 73 F.3d at 388.

        The fundamental question is not "whether there might exist any other documents

possibly responsive to the request, but rather whether the search for those documents was

adequate."  Steinberg v. United States Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994)

(quoting Weisberg v. United States Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  In

other words, "the focus of the adequacy inquiry is not on the results."  Hornbostel v. United

States Dep't of the Interior, 305 F. Supp. 2d 21, 28 (D.D.C. 2003); see also Meeropol v. Meese,

790 F.2d 942, 952 (D.C. Cir. 1986) (search is not unreasonable simply because it fails to produce

all relevant materials).  Further, the agency is "not obligated to look beyond the four corners of

the request for leads to the location of responsive documents."  Kowalczyk, 73 F.3d at 389

(holding that agency is not required to speculate about potential leads).

        An agency may use reasonably detailed, non-conclusory affidavits to demonstrate that it

conducted a reasonable search in accordance with the FOIA.  See Ground Saucer Watch, Inc. v.

CIA, 692 F.2d 770, 771 (D. C. Cir. 1981); see also Perry v. Block, 684 F.2d 121, 127 (D.C. Cir.

1982).  Those affidavits "enjoy a presumption of good faith, which will withstand purely

speculative claims about the existence and discoverability of other documents."  Ground Saucer

Watch, 692 F.3d at 771; see also Chamberlain v. United States Dep't of Justice, 957 F. Supp.

292, 294 (D.D.C. 1997) ("It is well established that '[a]gency affidavits enjoy a presumption of

good faith that withstand[s] purely speculative claims about the existence and discoverability of

other documents," (quoting <u>Albuquerque Publ'g Co. v. United States Dep't of Justice</u>, 726 F.

Supp. 851, 860 (D.D.C. 1989)).  Therefore, unless plaintiff can point to specific evidence

sufficient to put the agency's good faith into doubt, summary judgment must be granted to the

agency.  <u>Ground Saucer Watch</u>, 692 F.3d at 771.

     The declarations filed herewith establish that FDA conducted a reasonable and adequate

search for responsive records by employing a method reasonably expected to produce such

information.  As explained more fully below, FDA personnel identified the locations in which

the requested records might reasonably be located, and then conducted searches in those

locations.  As a result, FDA produced 28 pages of responsive records for the Clinton request to

the plaintiff on April 6, 2007.  <u>See</u> May Granger Decl., ¶ 5.  FDA additionally produced 31

pages of responsive records for the Murray request and 33 pages of responsive records for the

Enzi request on July 10, 2007.  <u>See</u> July Granger Decl., ¶ 6.

     For each of the requests, FDA's FOI office determined that FDA's Office of Legislation

("OL") would be the most likely office to have responsive records, and forwarded the request to

Ms. Granger in that office, who coordinated the agency's response to the Judicial Watch

requests.  <u>See</u> May Granger Decl., ¶ 8; July Granger Decl., ¶ 9.  Each of the requests was

processed in the same way:  OL staff searched the OL tracking system for any documents

concerning communications or correspondence between FDA and Senators Clinton, Murray, and

Enzi (or their agents or representatives) regarding Plan B.  <u>See</u> May Granger Decl., ¶ 10; July

Granger Decl., ¶ 11.  OL staff also searched OL phone records and email correspondence for

those terms.  <u>See id.</u>  All responsive records were produced to the plaintiff.  <u>See</u> May Granger

Decl., ¶ 5; July Granger Decl., ¶ 6.

     The Clinton, Murray, and Enzi requests also were forwarded to three other offices within

FDA that might have responsive documents: the Office of the Executive Secretariat, the Office of the General Counsel  – Food and Drug Division (OGC/FDD), Department of Health and Human Services, and the Immediate Office of the Commissioner.  See May Granger Decl., ¶ 11; July Granger Decl., ¶ 12.  Each of these offices conducted its own searches for responsive documents.  See id.

In the Office of the Executive Secretariat, Ms. Indya Mungo conducted a search for executive correspondence concerning communications or correspondence between FDA and Senators Clinton, Murray, and Enzi or their agents or representatives regarding Plan B.  See Declaration of Indya Mungo dated April 26, 2007, ¶ 5 ("April Mungo Decl.") (Exh. C hereto); Declaration of Indya Mungo dated July 11, 2007, ¶ 6 ("July Mungo Decl.") (Exh. D hereto).  All of the responsive documents that she located were forwarded to Ms. Granger in OL for production to Judicial Watch.  See id.

Similarly, in OGC/FDD, Ms. Karen Schifter supervised a search of OGC/FDD's Plan B litigation files for documents concerning communications or correspondence between FDA and Senators Clinton, Murray, and Enzi, or their agents or representatives.  See Declaration of Karen E. Schifter dated May 1, 2007, ¶ 4 ("May Schifter Decl.") (Exh. E hereto); Declaration of Karen E. Schifter dated July 12, 2007, ¶ 5 ("July Schifter Decl.") (Exh. F hereto).  All of the responsive documents that were located from those searches (and that were not exact duplicates of documents already in OL) were forwarded to OL for production to Judicial Watch.  See May Schifter Decl., ¶ 5; July Schifter Decl., ¶ 6.

Ms. Carol Crim in the Immediate Office of the Commissioner also conducted a search of the Commissioner's calendar records and meeting materials, and collected documents reflecting the dates of meetings between the Commissioner and Senator Clinton on Capitol Hill.  See

Declaration of Carol H. Crim, ¶ 4 (Exh. G hereto).  Those documents were sent to Ms. Granger

for production on April 6, 2007.  See id.  The meetings referred to in those calendar records took

place on Capitol Hill, and there are no FDA minutes or notes of what transpired in those

meetings.  See id. ¶ 5.  Ms. Crim is currently on extended medical leave, and was unable to

perform a search for documents for the later-filed Murray and Enzi requests.  Accordingly, Ms.

Kelly Palmer conducted a search of the Commissioner's calendar records and meeting materials,

and collected documents reflecting  the dates of meetings between the Commissioner and

Senators Enzi and Murray on Capitol Hill.  See Declaration of Kelly Palmer, ¶ 5 (Exh. H hereto).

All of the potentially responsive documents the Immediate Office located were provided to OL

for production to Judicial Watch. See id.  The meetings referred to in those calendar records took

place on Capitol Hill, and there are no FDA minutes or notes of what transpired in those

meetings.  See id. ¶ 6.

        As a result of the agency's good-faith search of all potentially responsive components,

the agency identified 28 pages of responsive documents for the Clinton request.  Ms. Granger

produced these documents to Judicial Watch on April 6, 2007.  See May Granger Decl., ¶ 5.

Similarly, the agency identified 31 pages of documents responsive to the Murray request, and 33

pages of documents responsive to the Enzi request.  July Granger Decl., ¶ 6.  All of those

documents were produced to Judicial Watch on July 10, 2007.  Id. ¶ 5.  No documents were

withheld or redacted for any of the requests.

        Judicial Watch has speculated, based on the public attention given to Plan B and the

number of documents released by FDA, that there must have been additional communications

between FDA and Senator Clinton.  See Dkt. Entry 12 at 5.  Judicial Watch also claimed that

comparing FDA's responses to the Murray and Enzi requests would allow Judicial Watch to

15

ascertain the thoroughness of FDA's search for the Clinton request.  See id.  However,"[m]ere

speculation that as yet uncovered documents may exist does not undermine the finding that the

agency conducted a reasonable search for them."  Safecard Services, Inc. v. SEC, 926 F.2d 1197,

1201 (D.C. Cir. 1991).  That is because FOIA does not require an agency to conduct a "perfect

search" which yields all responsive records.  Appleton v. FDA, 451 F. Supp. 2d 129, 137

(D.D.C. 2006).  It simply requires the agency to make a reasonable search for such records.

The declarations discussed above clearly demonstrate that FDA searched the offices

likely to have records responsive to the three FOIA requests, and produced all of those records to

Judicial Watch.  Those declarations "enjoy a presumption of good faith."  Ground Saucer Watch,

692 F.3d at 771.  The responses to the Enzi and Murray requests were approximately the same

size as the response to the Clinton request.  The similarity between the three releases debunks

Judicial Watch's theory that those later responses would show that the prior search was deficient,

and corroborates the declarations from FDA personnel describing the reasonableness of FDA's

search.  In sum, Judicial Watch's unsupported speculation falls far short of overcoming the

presumption of good faith accorded to those declarations, and cannot defeat defendant's motion

for summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss this action, or alternatively, enter summary judgment in favor of the defendant.

Dated: July 16, 2007                      Respectfully submitted,


                                                   /s/ Jeffrey A. Taylor
                                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                                          United States Attorney


                                                   /s/ Rudolph Contreras
                                          RUDOLPH CONTRERAS, D.C. BAR #434122
                                          Assistant United States Attorney


                                                   /s/ Robin M. Meriweather
                                          ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                          Assistant United States Attorney
                                          555 Fourth St., N.W.
                                          Washington, D.C.  20530
                                          Phone: (202) 514-7198
                                          Fax: (202) 514-8780
                                          Robin.Meriweather2@usdoj.gov

**Of Counsel:**

    Daniel Meron
    General Counsel


    Sheldon T. Bradshaw
    Chief Counsel
    Food and Drug Division

    Eric M. Blumberg
    Deputy Chief Counsel, Litigation

    Wendy S. Vicente
    Associate Chief Counsel
    United States Department of Health and Human Services
    Office of the General Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2007, I caused a copy of the foregoing

Motion to Dismiss or in the Alternative for Summary Judgment and Statement of Material Facts

Not In Genuine Dispute to be served upon Plaintiff by the Court's Electronic Case Filing system

or, should I receive notice from the ECF system indicating that electronic transmission failed, to

be served by first class mail, postage prepaid addressed to:

Paul J. Orfanedes
Judicial Watch, Inc.
501 School Street SW
Suite 500
Washington, DC 20024-2754


            /s/   Robin M. Meriweather
          Robin M. Meriweather, D.C. Bar # 490114

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| | ) | |
| **JUDICIAL WATCH, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-561 (RCL)** |
| | ) | |
| **U.S. FOOD AND DRUG** | ) | |
| **ADMINISTRATION** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

**DEFENDANT'S STATEMENT OF MATERIAL**
**FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rules 7(h) and 56.1, defendant United States Food and Drug Administration ("FDA") hereby submits the following statement of material facts as to which there is no genuine dispute. FDA believes that there are no material facts in dispute that would preclude disposition of this case on the merits by entry of summary judgment. The facts established below are sufficient to support the award of summary judgment to defendant.

1.    By letter dated August 22, 2006, Christopher J. Farrell of Judicial Watch, Inc. ("Judicial Watch") submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Hillary Rodham Clinton, . . . [and/or] any agent and/or representative of Senator Hillary Rodham Clinton, and/or the Office of Senator Hillary Rodham Clinton regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" (the "Clinton FOIA request") See Am. Compl. ¶ 5; Declaration of Lisa C. Granger dated May 2, 2007) ("May Granger Decl.") Exh. 1.

2.    On March 21, 2007, Judicial Watch sued FDA in the instant case to compel production of the requested documents under the FOIA. See Dkt. Entry 1.

3.    On April 6, 2007, FDA sent Judicial Watch the records responsive to the Clinton FOIA request, consisting of 28 pages of documents.  <u>See</u> May Granger Decl. ¶ 5; <u>id.</u> Exh. 2.  No documents were redacted or withheld.  <u>See</u> Granger Decl. ¶ 5.

4.    On April 20, 2007, Deronda Grothe submitted to FDA a FOIA request on behalf of Judicial Watch seeking "any and/or all communication and/or correspondence between the FDA and Senator Patty Murray, . . . [and/or] any agent and/or representative of Senator Patty Murray, and/or the Office of Senator Patty Murray regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Murray request").  <u>See</u> Am. Compl. ¶ 9; July Granger Decl. ¶ 3, <u>id.</u> Exh. A. ("Murray FOIA request").

5.    On April 23, 2007, Deronda Grothe submitted to FDA a FOIA request on behalf of Judicial Watch seeking "any and/or all communication and/or correspondence between the FDA and Senator Michael Enzi, . . . [and/or] any agent and/or representative of Senator Michael Enzi, and/or the Office of Senator Michael Enzi regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Enzi FOIA Request").  <u>See</u> Am. Compl. ¶ 13; July Granger Decl. ¶ 4; <u>id.</u> Exh. B.

6.    All of the documents FDA located that were responsive to the Murray and Enzi FOIA requests were produced on July 10, 2007.  <u>See</u> July Granger Decl. ¶ 6.  No documents were redacted or withheld.  <u>See</u> <u>id.</u>

7.    FDA conducted a thorough search for any responsive documents, as described in the declarations of Lisa C. Granger, Indya Mungo, Karen E. Schifter, Carol H. Crim, and Kelly Palmer.   In particular, the Clinton, Murray, and Enzi FOIA requests were sent to FDA's Office of Legislation ("OL"), which handles all Congressional inquiries.  <u>See</u> May Granger Decl. ¶ 9; July Granger Decl. ¶¶ 9-11.  An analyst on the OL staff conducted a search of the OL tracking system, OL phone records, and email correspondence for any responsive documents.  <u>See</u> May Granger

Decl.¶ 10; July Granger Decl. ¶ 11.

8.       The Clinton, Murray, and Enzi FOIA requests were also sent to FDA's Office of Executive Secretariat, which conducted its own search of any relevant documents pertaining to the Judicial Watch request.  See Declaration of Indya Mungo dated April 26, 2007, ¶¶ 4, 5 ("April Mungo Decl.") (Exh. C hereto); Declaration of Indya Mungo dated July 2007, ¶¶ 5-6 ("July Mungo Decl.") (Exh. D hereto).  Any responsive documents collected during this search were forwarded to OL. See April Mungo Decl. ¶ 6; July Mungo Decl. ¶ 7; May Granger Decl. ¶ 12; July Granger Decl. ¶ 12.

9.       The Clinton, Murray, and Enzi FOIA requests were also sent to the Office of the General Counsel – Food and Drug Division ("OGC/FDD") of the Department of Health and Human Services.  See Declaration of Karen E. Schifter dated May 1, 2007, at ¶ 4 ("May Schifter Decl.") (Exh. E hereto); Declaration of Karen E. Schifter dated July 12, 2007, at ¶ 5 ("July Schifter Decl.") (Exh. F hereto).   Ms. Schifter supervised a search for all responsive documents within OGC/FDD's Plan B litigation documents.  See May Schifter Decl. ¶ 4; July Schifter Decl. ¶ 5.  She compared the documents responsive to the Clinton FOIA request to the documents collected by OL, and produced to OL any responsive documents that were not exact duplicates of the documents already collected by OL.  See May Schifter Decl. ¶ 5.   Ms. Schifter forwarded all of the documents that she located that were responsive to the Enzi and Murray requests to OL for production to Judicial Watch.  July Schifter Decl. ¶ 6.

10.       The Clinton, Murray, and Enzi FOIA requests were also sent to the Immediate Office of the Office of the Commissioner, which conducted a search of the Commissioner's calendar records.  See Declaration of Carol H. Crim ¶ 4 ("Crim Decl.") (Exh. G hereto); Declaration of Kelly Palmer ¶ 5 ("Palmer Decl.") (Exh. H hereto).  That office collected records concerning meetings between the Commissioner and Senators Clinton, Enzi, and/or Murray on

Capitol Hill.  See Crim Decl. ¶ 4; Palmer Decl. ¶ 5.  No minutes or notes were taken at those meetings.  See Crim Decl. ¶ 5; Palmer Decl. ¶ 6.  That office forwarded all of the responsive documents to OL for production to Judicial Watch.  See Crim Decl. ¶ 5; Palmer Decl. ¶ 5.  The calendar records were produced to Judicial Watch on April 6, 2007 and July 10, 2007.  See May Granger Decl. ¶ 13; July Granger Decl. ¶ 6.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**Of Counsel:**

Daniel Meron
General Counsel

Sheldon T. Bradshaw
Chief Counsel
Food and Drug Division

Eric M. Blumberg
Deputy Chief Counsel, Litigation

Wendy S. Vicente
Associate Chief Counsel
United States Department of Health and Human Services
Office of the General Counsel

## DECLARATION OF LISA C. GRANGER

I, Lisa C. Granger, do hereby declare under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Supervisory Congressional Analyst, Office of Legislation ("OL"), Office of the Commissioner, United States Food and Drug Administration ("FDA").

2. My responsibilities include, among other things, oversight of the requests made to FDA under the Freedom of Information Act ("FOIA") that are internally directed to OL.

3. By letter dated August 22, 2006, Christopher J. Farrell of Judicial Watch, Inc. submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Hillary Rodham Clinton, . . . [and/or] any agent and/or representative of Senator Hillary Rodham Clinton, and/or the Office of Senator Hillary Rodham Clinton regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" (The FOIA request is attached as Exhibit 1).

4. On August 24, 2006, FDA sent Judicial Watch an acknowledgment of the receipt of the request. On January 26, 2007, Judicial Watch submitted a follow-up inquiry.

5. On April 6, 2007, I sent to Judicial Watch the records responsive to its request. No documents were redacted or withheld. There were 28 pages of documents. (The letter and the enclosures are attached as Exhibit 2).

6. In my April 6, 2007 cover letter to Judicial Watch, I explained as follows:

As you may be aware, FDA currently has a significant backlog of FOI requests. Courts have recognized that this backlog is a regrettable but unavoidable consequence of the abundance of FOI requests received by FDA and the limited resources available to FDA for responding to such requests. Nevertheless, because your request was processed in the track for less cumbersome requests, we are able to respond at this time.

Exhibit 1.

7. I understand that, after FDA had produced the responsive documents, counsel for the government asked counsel for Judicial Watch whether it planned to dismiss this case. Counsel for Judicial Watch apparently expressed doubt, based only on the quantity of documents produced, regarding the adequacy of FDA's search. Accordingly, I describe below the search that the agency undertook.

8. As a first step after a FOI request is received, FDA's headquarters FOI office, the Division of Freedom of Information, identifies the agency component or components most likely to have responsive documents. In this case, that office identified OL as the most likely to have responsive documents and accordingly referred the Judicial Watch request to me. OL therefore coordinated the agency's response to the Judicial Watch request.

9. OL is the agency component responsible for coordinating and preparing agency responses to Congressional and legislative inquiries on various issues that affect the agency including proposed legislation, oversight, investigative, and constituent matters. Under FDA procedures, all Congressional inquiries, no matter where in FDA they are directed, should be coordinated with OL. In addition, OL is responsible for coordinating the drafting of Congressional testimony. Thus, virtually all of the documents responsive to the Judicial Watch request should be in the possession of OL.

10. I requested that an analyst on the OL staff conduct a search of the OL tracking

2

system for any communications or correspondence between FDA and Senator Clinton or her agents or representatives regarding Plan B. We also conducted a search of OL phone records and email correspondence for those terms. All of the responsive documents that we located were produced in my letter to Judicial Watch on April 6, 2007.

11. The FOIA request was also conveyed to the only other offices within FDA that might reasonably be expected to have responsive documents: the Office of the Executive Secretariat, the Immediate Office of the Office of the Commissioner, and the Office of the General Counsel (OGC) — Food and Drug Division of the Department of Health and Human Services.

12. I determined that the Office of the Executive Secretariat did not have any responsive documents that were not exact duplicates of the documents that I collected in OL. Ms. Karen Schifter, counsel in OGC, determined that OGC did not have any responsive documents that were not exact duplicates of the documents that I collected in OL.

13. I additionally determined that the Immediate Office of the Office of the Commissioner had collected documents reflecting the dates of meetings between the Commissioner and Senator Clinton that had not been collected in OL. Accordingly, I produced those documents along with the OL documents in my letter to Judicial Watch on April 6, 2007.

Executed on May 2, 2007.

Lisa C. Granger
Supervisory Congressional Analyst
Office of Legislation
United States Food and Drug Administration

3

# EXHIBIT 1



**Judicial Watch**™

*Because no one is above the law!*

PRIVACY: _____
FEE WAIVER: ✓
UNPURGED _____
DO NOT RELEASE: _____

## VIA FACSIMILE AND CERTIFIED US MAIL

August 22, 2006

Betty B. Dorsey
Director, FOI Staff
U. S. FOOD AND DRUG
   ADMINISTRATION (FDA)
5600 Fishers Lane (HFI-30)
Rockville, MD 20857
(Fax. No.: 301-443-1726)
(Art. No.: 7005 1160 0000 8541 8433)

**06 - 14086**
**RECEIVED**
AUG 3 0 2006
**FDA DFOI (HFI-35)**

### Re: Freedom of Information Act Request

Dear Sir/Madam:

    Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the U. S. Food and Drug Administration (hereafter "FDA") produce the following agency records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, within twenty (20) business days:

    1) Any and/or all communication and/or correspondence between the FDA and Senator Hillary Rodham Clinton (D-NY) regarding ".75 levonorgestrel" also sold under the trade name "Plan B."

    2) Any and/or all communication and/or correspondence between the FDA and any agent and/or representative of Senator Hillary Rodham Clinton (D-NY), and/or the Office of Senator Hillary Rodham Clinton regarding ".75 levonorgestrel" also sold under the trade name "Plan B."

    For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns,

DIVISION OF FOI

REQUESTER TYPE: _____
REQUESTER CATEGORY: _____

HF-40
HFW1

**U.S. Food and Drug Administration**
**FOIA Request**
**August 22, 2006**
**Page 2 of 7**

computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes, compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website

**U.S. Food and Drug Administration**
**FOIA Request**
**August 22, 2006**
**Page 3 of 7**

is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 18,000 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example:

- September 1998 – Judicial Watch, Inc. published the Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among among other regular means.

- August 1999 – Judicial Watch published Filegate Status Report, which is 136 pages long and is supported by nearly 1000 pages of documentation.

- March 2001 – Judicial Watch published The Judicial Watch Florida Recount, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon a sampling of ballots reviewed by Judicial Watch pursuant to Florida's version of FOIA.

- February 2002 – Judicial Watch published The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."

- September 2002 – Judicial Watch published Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists.

- November 21, 2003 – Judicial Watch produced Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility. (GAO-04-2057T/October23, 2003). Comptroller General of the United States David M. Walker, in a reply to Judicial Watch's Analysis of GAO Testimony, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C."

- June 29, 2005 – Judicial Watch produced a special Report US Border Patrol Survey Analysis, an analysis of documents produced under FOIA.

http://www.judicialwatch.org/borderpatrolreport.shtml

- February 3, 2006 – Judicial Watch held an educational panel at the National Press Club and published a Special Report of the event, "A Discussion of Ethics in Washington."
  http://www.judicialwatch.org/archive/2006/special-report-ethics.pdf

- May 9, 2006 – Judicial Watch produced The Clinton RU-486 Files, a special report of the Clinton administration's effort to put the abortion drug RU-486 on the market in the United States, based on documents obtained from the National Archives at the Clinton Presidential Library and in the course of a five year FOIA litigation battle between Judicial Watch and the U.S. Food and Drug Administration (FDA).

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001).

Judicial Watch hold quarterly education panels at the National Press Club in Washington DC that have been televised by C-SPAN. Past panel discussions have been: "A Discussion of Ethics in Washington," "The Case for Open Government," "Conservative Perspectives on the Alito Nomination," and "The Role of Grassroots Groups in the Supreme Court Nominating Process."

Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events.

On February 16, 2005, Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being on of the nation's top ten "watchdogs."

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. See *National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. See *Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

**U.S. Food and Drug Administration**
**FOIA Request**
**August 22, 2006**
**Page 5 of 7**

> shall be furnished without any charge or at a charge
> reduced below the fees established under clause (ii) if
> disclosure of the information is in the public interest
> because it is likely to contribute significantly to public
> understanding of the operations or activities of government
> and is not primarily in the commercial interest of the
> requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. As part of its Transparency Project, Judicial Watch is investigating process for over-the-counter (hereafter "OTC") status for "Plan B."

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. See *D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely the communication between the United States Congress and the FDA regarding "Plan B."[1]

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience. The American public is obviously interested in the safety and medical concerns of the drug approval process of the FDA.

---

[1]    Kurt Eichenwald and Michael Moss. "Rising Numbers Sought Pardons in Last 2 Years," *The New York Times*. January 29, 2001.

**U.S. Food and Drug Administration**
**FOIA Request**
**August 22, 2006**
**Page 6 of 7**

Indeed, the American public deserves full disclosure of the details of the apparent decision of the FDA to allow ".75 levonorgestrel" referred to informally as the "morning after pill" or by its trade name "Plan B," to be sold over-the-counter ("OTC"), as opposed to its current status as a prescription medication ("Rx"), to women 18 years and older.[2] According to press reports, United States Senators put public pressure on the FDA to change the status of "Plan B" from Rx to OTC, going so far as to hold up the Senate nomination of Dr. Andrew von Eschenbach, and last year, the nomination of former FDA commissioner Lester Crawford, to force the decision. Facts have been raised as to the ability of "Plan B" to act as an abortifacient,[3] as well as the level of hormones contained in "Plan B" being a health risk to women.[4]   Without question the public deserves full disclosure of the lobbying of the FDA by public officials for its approval.

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the correspondence between Senator Clinton and the FDA on the matter. Senators Clinton and Patty Murray (D-Washington), stated that they would block a floor vote on the von Eschenbach confirmation until the FDA makes a final "yes or no" decision on the drug's sale.[5] Without question the records requested by Judicial Watch will shed further light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

---

[2]   Jonathan D. Rockoff. "Senators Wary of FDA Action on Plan B," *The Baltimore Sun*. August 1, 2006.

[3]   *See* Statement of Judie Brown, President of American Life League.  Testimony before the Reproductive Health Drug Advisory Committee. Center for Drug Evaluation (CDER). December 16, 2003. Division of Dockets Management (HFA-305). Docket No. 2001P-0075.

[4]   Wendy Wright. "Easy Access Poses Risks," *USA Today*. April 18, 2004.

[5]   Jonathan D. Rockoff. "Senators Wary of FDA Action on Plan B," *The Baltimore Sun*. August 1, 2006.

**U.S. Food and Drug Administration**
**FOIA Request**
**August 22, 2006**
**Page 7 of 7**

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

)
JUDICIAL WATCH, INC.,                        )
)
     Plaintiff,               )
)
    v.                               )  Civil Action No. 07-561 (RCL)
)
U.S. FOOD AND DRUG                           )
ADMINISTRATION,                              )
)
     Defendant.              )
            )

### DECLARATION OF LISA C. GRANGER

  I, Lisa C. Granger, do hereby declare under penalties of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct to the best of my knowledge, information, and

belief:

  1. I am a Supervisory Congressional Analyst, Office of Legislation ("OL"), Office of the

Commissioner, United States Food and Drug Administration ("FDA").

  2. My responsibilities include, among other things, oversight of the requests made to

FDA under the Freedom of Information Act ("FOIA") that are internally directed to OL.

  3. By request submitted on April 20, 2007, Deronda Grothe of Judicial Watch, Inc.

("Judicial Watch") submitted to FDA a request under FOIA for "any and/or all communication

and/or correspondence between the FDA and Senator Patty Murray, . . . [and/or] any agent

and/or representative of Senator Patty Murray, and/or the Office of Senator Patty Murray

regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" A copy of that request

("Murray Request") is attached as Exhibit A.

4. By an additional request submitted on April 23, 2007, Deronda Grothe of Judicial Watch submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Michael Enzi, . . . [and/or] any agent and/or representative of Senator Michael Enzi, and/or the Office of Senator Michael Enzi regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" A copy of that request ("Enzi Request") is attached as Exhibit B.

5. By letters dated April 20 and April 23, 2007, FDA acknowledged receipt of Judicial Watch's Murray and Enzi Requests, respectively. See Exhibits C and D.

6. On July 10, 2007, I sent to Judicial Watch the records responsive to the Murray and Enzi Requests. No documents were redacted or withheld. There were 31 pages of documents responsive to the Murray Request, and 33 pages of documents responsive to the Enzi Request. (The letters and enclosures are attached as Exhibits E and F).

7. In my July 10, 2007 cover letters to Judicial Watch, I explained as follows:

> As you may be aware, FDA currently has a significant backlog of FOI requests. Courts have recognized that this backlog is a regrettable but unavoidable consequence of the abundance of FOI requests received by FDA and the limited resources available to FDA for responding to such requests. Nevertheless, because your requests were processed in the track for less cumbersome requests, we are able to respond at this time.

Exhibits E and F.

8. I understand that counsel for Judicial Watch has expressed doubts regarding the adequacy of FDA's search for documents for a similar FOIA request at issue in *Judicial Watch, Inc. v. FDA*, No. 07-561 (D.D.C.)., and that Judicial Watch has amended its complaint in that case to seek relief for the Murray and Enzi Requests. Accordingly, I describe below the search that the agency undertook for the Murray and Enzi requests.

2

9. As a first step after a FOI request is received, FDA's headquarters FOI office, the Division of Freedom of Information, identifies the agency component or components most likely to have responsive documents. In this case, that office identified OL as the most likely to have responsive documents and accordingly referred the Murray and Enzi Requests to me. OL therefore coordinated the agency's response to the Murray and Enzi Requests.

10. OL is the agency component responsible for coordinating and preparing agency responses to Congressional and legislative inquiries on various issues that affect the agency including proposed legislation, oversight, investigative, and constituent matters. Under FDA procedures, all Congressional inquiries, no matter where in FDA they are directed, should be coordinated with OL. In addition, OL is responsible for coordinating the drafting of Congressional testimony. Thus, virtually all of the documents responsive to the Murray and Enzi Requests should be in the possession of OL.

11. I requested that an analyst on the OL staff conduct a search of the OL tracking system for any communications or correspondence between FDA and Senators Murray and Enzi or their agents or representatives regarding Plan B. We also conducted a search of OL phone records and email correspondence for those terms. All of the responsive documents that we located were produced in my letter to Judicial Watch on July 10, 2007.

12. The FOIA request was also conveyed to the only other offices within FDA that might reasonably be expected to have responsive documents: the Office of the Executive Secretariat, the Immediate Office of the Office of the Commissioner, and the Office of the General Counsel (OGC) — Food and Drug Division of the Department of Health and Human Services. All of the responsive documents located in those offices that were not exact duplicates of the documents that I collected in OL were produced in my letter to Judicial Watch dated July 10, 2007.

Executed on July 12, 2007.

Lisa C. Granger
Supervisory Congressional Analyst
Office of Legislation
United States Food and Drug Administration

# Exhibit A

04/18/2007 12:20 FAX 202 646 5199          JUDICIAL WATCH, INC.                    002



**Judicial Watch**™
*Because no one
is above the law!*

07-4204

**RECEIVED**

APR 2 0 2007

**FDA DFOI (HFI-35)**

April 18, 2007

<u>**VIA CERTIFIED MAIL & FAX**</u>

Betty B. Dorsey
Director, FOI Staff
U.S. FOOD AND DRUG
   ADMINISTRATION (FDA)
5600 Fishers Lane (HFI-30)
Rockville, MD 20857
301-443-1726 fax
(Art. No.: 70051160000150194811)

<u>**Re: Freedom of Information Act Request**</u>

Dear Ms. Dorsey:

 Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C.
§ 552, Judicial Watch, Inc. hereby requests that the U. S. Food and Drug Administration
(hereafter "FDA") produce the following agency records concerning the following
subjects within twenty (20) business days:

 1. Any and/or all communication and/or correspondence between the FDA
  and Senator Patty Murray (D-WA) regarding ".75 levonorgestrel" also
  sold under the trade name "Plan B."

 2. Any and/or all communication and/or correspondence between the FDA
  and any agent and/or representative of Senator Patty Murray and/or the
  Office of Senator Patty Murray regarding ".75 levonorgestrel" also sold
  under the trade name "Plan B."

 For purpose of this request, the term "record" shall mean: (1) any written,
printed, or typed material of any kind, including without limitation all correspondence,
memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers,
forms, records, telephone messages, diaries, schedules, calendars, chronological data,
minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns,
computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys,
affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press
releases; (2) any electronically, magnetically, or mechanically stored material of any

501 School Street, SW Suite 500 Washington, DC 20024 Tel: (202) 646-5172 (888) JW-ETHIC
Fax: (202) 646-5199 email: info@judicialwatch.org Web Site: www.JudicialWatch.org

**Food and Drug Administration**
**FOIA Request**
**April 18, 2007**
**Page 2 of 7**

kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes, compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

**Food and Drug Administration**
**FOIA Request**
**April 18, 2007**
**Page 3 of 7**

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 18,000 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example:

- September 1998 – Judicial Watch, Inc. published the Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among other regular means.

- August 1999 – Judicial Watch published Filegate Status Report, which is 136 pages long and is supported by nearly 1000 pages of documentation.

- March 2001 – Judicial Watch published The Judicial Watch Florida Recount, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon a sampling of ballots reviewed by Judicial Watch pursuant to Florida's version of FOIA.

- February 2002 – Judicial Watch published The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."

- September 2002 – Judicial Watch published Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists.

- November 21, 2003 – Judicial Watch produced Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility. (GAO-04-2057T/October23, 2003). Comptroller General of the United States David M. Walker, in a reply to Judicial Watch's Analysis of GAO Testimony, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C."

- June 29, 2005 – Judicial Watch produced a special Report US Border Patrol Survey Analysis, an analysis of documents produced under FOIA. http://www.judicialwatch.org/borderpatrolreport.shtml

04/18/2007 12:21 FAX 202 646 5199          JUDICIAL WATCH, INC.                          ☑005

**Food and Drug Administration**
**FOIA Request**
**April 18, 2007**
**Page 4 of 7**

- February 3, 2006 – Judicial Watch held an educational panel at the National Press Club and published a Special Report of the event, "A Discussion of Ethics in Washington."
  http://www.judicialwatch.org/archive/2006/special-report-ethics.pdf

- May 9, 2006 – Judicial Watch produced The Clinton RU-486 Files, a special report of the Clinton administration's effort to put the abortion drug RU-486 on the market in the United States, based on documents obtained from the National Archives at the Clinton Presidential Library and in the course of a five year FOIA litigation battle between Judicial Watch and the U.S. Food and Drug Administration (FDA).  http://judicialwatch.org/archive/2006/jw-ru486-report.pdf

- June 15, 2006 – Judicial Watch publishes "Jesse Jackson Exposed," a special report details the intimidation and shakedown tactics of Jackson's so-called civil rights organization, the Rainbow Push Coalition.
  http://judicialwatch.org/archive/2006/jackson-report.pdf

- October 30, 2006 – Judicial Watch releases a special report "*Academia Semillas del Pueblo* (Seeds of the People Academy):  Training the Next Generation of Mexican Revolutionaries with American Tax Dollars."  The report includes excerpts of new documents obtained by Judicial Watch through the California Public Records Act that highlight the school's radical agenda.
  http://www.judicialwatch.org/archive/2006/SR_academia%20semillas.pdf

- November 27, 2006 – Judicial Watch publishes New Clinton White House Records Raise Disturbing Questions about Hillary Clinton and Abortion. Judicial Watch's report includes excerpts of new documents obtained by Judicial Watch from the Clinton Presidential Library in Little Rock, Arkansas.
  http://www.judicialwatch.org/archive/2006/SR_Clinton%20abortion.pdf

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001).

Judicial Watch hold quarterly education panels at the National Press Club in Washington DC that have been televised by C-SPAN. Past panel discussions have been: "Defining 'Judicial Activism' in the Context of the Culture Wars," "A Discussion of Ethics in Washington," "The Case for Open Government," "Conservative Perspectives on the Alito Nomination," "The Role of Grassroots Groups in the Supreme Court Nominating Process," "New Fronts in the Immigration Battle," and "How to Fight Corruption in Government."

04/18/2007 12:21 FAX 202 646 5199          JUDICIAL WATCH, INC.                              ✐006

**Food and Drug Administration**
**FOIA Request**
**April 18, 2007**
**Page 5 of 7**

Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events.

On February 16, 2005, Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being on of the nation's top ten "watchdogs."

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. See *National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. See *Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000); and, *Judicial Watch, Inc. v. Dep't of Defense*, 2006 U.S. Dist. LEXIS 44003, *1 (D.D.C. June 28, 2006).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. As part of its role as a government watchdog, Judicial Watch is investigating Senator Feinstein's potential ethics violations.

Courts applying the "public interest" fee waiver provision of FOIA typically take into account  four factors in determining whether to grant a waiver:  (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. See *D.C.*

04/18/2007 12:21 FAX 202 646 5199          JUDICIAL WATCH, INC.                              ☑007

**Food and Drug Administration**
**FOIA Request**
**April 18, 2007**
**Page 6 of 7**

*Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. §
16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-
case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and
activities of government, namely the communication between the United States Congress
and the FDA regarding "Plan B."

Disclosure of the requested records is likely to contribute to an understanding of
government operations and activities and will appeal to a "reasonably broad" audience.
The American public is obviously interested in the safety and medical concerns of the
drug approval process of the FDA.

Indeed, the American public deserves full disclosure of the details of the apparent
decision of the FDA to allow ".75 levonorgestrel" referred to informally as the "morning
after pill" or by its trade name "Plan B," to be sold over-the-counter ("OTC"), as opposed
to its current status as a prescription medication ("Rx"), to women 18 years and older.[1]
According to press reports, United States Senators put public pressure on the FDA to
change the status of "Plan B" from Rx to OTC, going so far as to hold up the Senate
nomination of Dr. Andrew von Eschenbach, and last year, the nomination of former FDA
commissioner Lester Crawford, to force the decision. Facts have been raised as to the
ability of "Plan B" to act as an abortifacient,[2] as well as the level of hormones contained
in "Plan B" being a health risk to women.[3] Without question the public deserves full
disclosure of the lobbying of the FDA by public officials for its approval.

Once Judicial Watch obtains the requested records, it intends to analyze them and
disseminate the results of its analysis, as well as the records themselves, as a special
written report. Judicial Watch will also educate the public via radio programs, Judicial
Watch's website, and/or newsletter, among other outlets. It also will make the records
available to other members of the media or researchers upon request. Judicial Watch has
a proven ability to disseminate information obtained through FOIA to the public, as
demonstrated by its long-standing and continuing public outreach efforts, including radio
and television programs, website, newsletter, periodic published reports, public
appearances, and other educational undertakings.

---

[1] Jonathan D. Rockoff. "Senators Wary of FDA Action on Plan B." *The Baltimore Sun*. August 1, 2006.

[2] *See* Statement of Judie Brown, President of American Life League. Testimony before the Reproductive
Health Drug Advisory Committee. Center for Drug Evaluation (CDER). December 16, 2003. Division of
Dockets Management (HFA-305). Docket No. 2001P-0075.

[3] Wendy Wright, "Easy Access Poses Risks," *USA Today*. April 18, 2004.

501 School Street, SW     Suite 500     Washington, DC 20024     Tel: (202) 646-5172     (888) JW-ETHIC
Fax: (202) 646-5199     email: info@judicialwatch.org     Web Site: www.JudicialWatch.org

**Food and Drug Administration**
**FOIA Request**
**April 18, 2007**
**Page 7 of 7**

     Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the correspondence between Senator Murray and the FDA on the matter. Senators Murray and Hillary Clinton (D-NY), stated that they would block a floor vote on the von Eschenbach confirmation until the FDA makes a final "yes or no" decision on the drug's sale.[4] Without question the records requested by Judicial Watch will shed further light on this important matter.

     Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

     We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days. We take the statutory deadlines of the Freedom of Information Act very seriously – as does the Archivist of the United States:

       **"Let's face it, access delayed is access denied."**
           Dr. Allen Weinstein
           Ninth Archivist of the United States
           National Archives and Records Administration
           September 26, 2006
           American Society of Access Professionals Keynote Speech
           Washington, DC

     Thank you for your cooperation.

Sincerely,

*Deronda Grothe*

Deronda Grothe
Program Manager

---

[4] Jonathan D. Rockoff. "Senators Wary of FDA Action on Plan B," *The Baltimore Sun*. August 1, 2006.

# Exhibit B

04/20/2007 12:35 FAX 202 646 5199          JUDICIAL WATCH, INC.                    ✍002



**07-4257**
**RECEIVED**
APR 2 3 2007
**FDA DFOI (HFI-35)**

April 20, 2007

**VIA CERTIFIED MAIL & FAX**

Betty B. Dorsey
Director, FOI Staff
U.S. FOOD AND DRUG
    ADMINISTRATION (FDA)
5600 Fishers Lane (HFI-30)
Rockville, MD 20857
301-443-1726 fax
(Art. No.: 70051160000150194835)

**Re: Freedom of Information Act Request**

Dear Ms. Dorsey:

    Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the U. S. Food and Drug Administration (hereafter "FDA") produce the following agency records concerning the following subjects within twenty (20) business days:

    1.  Any and/or all communication and/or correspondence between the FDA and Senator Michael Enzi (R-WY) regarding ".75 levonorgestrel" also sold under the trade name "Plan B."

    2.  Any and/or all communication and/or correspondence between the FDA and any agent and/or representative of Senator Michael Enzi and/or the Office of Senator Michael Enzi regarding ".75 levonorgestrel" also sold under the trade name "Plan B."

    For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any

**Food and Drug Administration**
**FOIA Request**
**April 20, 2007**
**Page 2 of 7**

kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes, compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

**Food and Drug Administration**
**FOIA Request**
**April 20, 2007**
**Page 3 of 7**

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 18,000 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example:

- September 1998 – Judicial Watch, Inc. published the Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among other regular means.

- August 1999 – Judicial Watch published Filegate Status Report, which is 136 pages long and is supported by nearly 1000 pages of documentation.

- March 2001 – Judicial Watch published The Judicial Watch Florida Recount, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon a sampling of ballots reviewed by Judicial Watch pursuant to Florida's version of FOIA.

- February 2002 – Judicial Watch published The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."

- September 2002 – Judicial Watch published Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists.

- November 21, 2003 – Judicial Watch produced Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility. (GAO-04-2057T/October23, 2003). Comptroller General of the United States David M. Walker, in a reply to Judicial Watch's Analysis of GAO Testimony, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C."

- June 29, 2005 – Judicial Watch produced a special Report US Border Patrol Survey Analysis, an analysis of documents produced under FOIA. http://www.judicialwatch.org/borderpatrolreport.shtml

04/20/2007 12:35 FAX 202 646 5199        JUDICIAL WATCH, INC.                    ☑005

**Food and Drug Administration**
**FOIA Request**
**April 20, 2007**
**Page 4 of 7**

- February 3, 2006 – Judicial Watch held an educational panel at the National Press Club and published a Special Report of the event, "A Discussion of Ethics in Washington."
  http://www.judicialwatch.org/archive/2006/special-report-ethics.pdf

- May 9, 2006 – Judicial Watch produced The Clinton RU-486 Files, a special report of the Clinton administration's effort to put the abortion drug RU-486 on the market in the United States, based on documents obtained from the National Archives at the Clinton Presidential Library and in the course of a five year FOIA litigation battle between Judicial Watch and the U.S. Food and Drug Administration (FDA).  http://judicialwatch.org/archive/2006/jw-ru486-report.pdf

- June 15, 2006 – Judicial Watch publishes "Jesse Jackson Exposed," a special report details the intimidation and shakedown tactics of Jackson's so-called civil rights organization, the Rainbow Push Coalition.
  http://judicialwatch.org/archive/2006/jackson-report.pdf

- October 30, 2006 – Judicial Watch releases a special report *Academia Semillas del Pueblo* (Seeds of the People Academy):  Training the Next Generation of Mexican Revolutionaries with American Tax Dollars." The report includes excerpts of new documents obtained by Judicial Watch through the California Public Records Act that highlight the school's radical agenda.
  http://www.judicialwatch.org/archive/2006/SR_academia%20semillas.pdf

- November 27, 2006 – Judicial Watch publishes New Clinton White House Records Raise Disturbing Questions about Hillary Clinton and Abortion.  Judicial Watch's report includes excerpts of new documents obtained by Judicial Watch from the Clinton Presidential Library in Little Rock, Arkansas.
  http://www.judicialwatch.org/archive/2006/SR_Clinton%20abortion.pdf

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001).

Judicial Watch hold quarterly education panels at the National Press Club in Washington DC that have been televised by C-SPAN. Past panel discussions have been: "Defining 'Judicial Activism' in the Context of the Culture Wars," "A Discussion of Ethics in Washington," "The Case for Open Government," "Conservative Perspectives on the Alito Nomination," "The Role of Grassroots Groups in the Supreme Court Nominating Process," "New Fronts in the Immigration Battle," and "How to Fight Corruption in Government."

501 School Street, SW    Suite 500    Washington, DC 20024    Tel: (202) 646-5172    (888) JW-ETHIC
Fax: (202) 646-5199    email: info@judicialwatch.org    Web Site: www.JudicialWatch.org

04/20/2007 12:35 FAX 202 646 5199          JUDICIAL WATCH, INC.                    ☑006

**Food and Drug Administration**
**FOIA Request**
**April 20, 2007**
**Page 5 of 7**

Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events.

On February 16, 2005, Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being on of the nation's top ten "watchdogs."

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. See *National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. See *Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000); and, *Judicial Watch, Inc. v. Dep't of Defense*, 2006 U.S. Dist. LEXIS 44003, *1 (D.D.C. June 28, 2006).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. As part of its role as a government watchdog, Judicial Watch is investigating Senator Feinstein's potential ethics violations.

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. See *D.C.*

04/20/2007 12:36 FAX 202 646 5199          JUDICIAL WATCH, INC.                    ☑007

**Food and Drug Administration**
**FOIA Request**
**April 20, 2007**
**Page 6 of 7**

*Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. §
16.11(k)(2)(i)-(iv).  Request for "public interest" waivers are to be judged on a case-by-
case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

  Without question, the subject-matter of the request concerns the operations and
activities of government, namely the communication between the United States Congress
and the FDA regarding "Plan B."

  Disclosure of the requested records is likely to contribute to an understanding of
government operations and activities and will appeal to a "reasonably broad" audience.
The American public is obviously interested in the safety and medical concerns of the
drug approval process of the FDA.

  Indeed, the American public deserves full disclosure of the details of the apparent
decision of the FDA to allow ".75 levonorgestrel" referred to informally as the "morning
after pill" or by its trade name "Plan B," to be sold over-the-counter ("OTC"), as opposed
to its current status as a prescription medication ("Rx"), to women 18 years and older.[1]
According to press reports, United States Senators put public pressure on the FDA to
change the status of "Plan B" from Rx to OTC, going so far as to hold up the Senate
nomination of Dr. Andrew von Eschenbach, and last year, the nomination of former FDA
commissioner Lester Crawford, to force the decision.  Facts have been raised as to the
ability of "Plan B" to act as an abortifacient,[2] as well as the level of hormones contained
in "Plan B" being a health risk to women.[3]  Without question the public deserves full
disclosure of the lobbying of the FDA by public officials for its approval.

  Once Judicial Watch obtains the requested records, it intends to analyze them and
disseminate the results of its analysis, as well as the records themselves, as a special
written report. Judicial Watch will also educate the public via radio programs, Judicial
Watch's website, and/or newsletter, among other outlets.  It also will make the records
available to other members of the media or researchers upon request. Judicial Watch has
a proven ability to disseminate information obtained through FOIA to the public, as
demonstrated by its long-standing and continuing public outreach efforts, including radio
and television programs, website, newsletter, periodic published reports, public
appearances, and other educational undertakings.

---

[1] Jonathan D. Rockoff. "Senators Wary of FDA Action on Plan B," *The Baltimore Sun*. August 1, 2006.

[2] *See* Statement of Judie Brown, President of American Life League. Testimony before the Reproductive
Health Drug Advisory Committee. Center for Drug Evaluation (CDER). December 16, 2003. Division of
Dockets Management (HFA-305). Docket No. 2001P-0075.

[3] Wendy Wright. "Easy Access Poses Risks," *USA Today*. April 18, 2004.

**Food and Drug Administration**
**FOIA Request**
**April 20, 2007**
**Page 7 of 7**

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the correspondence between Senator Enzi and the FDA on the matter. Senators Patty Murray (D-WA) and Hillary Clinton (D-NY), stated that they would block a floor vote on the von Eschenbach confirmation until the FDA makes a final "yes or no" decision on the drug's sale.[4] According to records released by the FDA to Judicial Watch on April 6, 2007, Senator Enzi joined Senators Murray and Clinton in a meeting with Dr. von Eschenbach to discuss Plan B. (See Enclosure.) Without question the records requested by Judicial Watch will shed further light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days. We take the statutory deadlines of the Freedom of Information Act very seriously – as does the Archivist of the United States:

> **"Let's face it, access delayed is access denied."**
>                         Dr. Allen Weinstein
>                         Ninth Archivist of the United States
>                         National Archives and Records Administration
>                         September 26, 2006
>                         American Society of Access Professionals Keynote Speech
>                         Washington, DC

Thank you for your cooperation.

Sincerely,

Deronda Grothe
Program Manager

Enclosures

---

[4] Jonathan D. Rockoff. "Senators Wary of FDA Action on Plan B," *The Baltimore Sun.* August 1, 2006.

**Subject:**    POSTPONED: Meeting w/Senators Enzi/Clinton/Murray
**Location:**   Senate Russell Building, Room 379A; contact: Alana Weinstein, 202-224-
                3424 on 2/28

**Start:**        Thu 3/9/2006 12:00 AM
**End:**          Fri 3/10/2006 12:00 AM
**Show Time As:** Free

**Recurrence:**   (none)

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Tuesday, February 28, 2006 5:39 PM
**To:** Crim, Carol H
**Subject:** RE: Meeting

Great we are confirmed. Thank you.

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Tuesday, February 28, 2006 5:38 PM
**To:** Weinstein, Alana (Enzi)
**Subject:** RE: Meeting
**Importance:** High

Alana,

One more time — with message...

Yes, the date/time will work for Dr. von Eschenbach.

Thanks,

Carol

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Tuesday, February 28, 2006 5:04 PM
**To:** Crim, Carol H
**Subject:** RE: Meeting

Ok, I have all three Senators - Senator Enzi, Senator Clinton, and Senator Murray on board for
5:00 PM meeting on March 9th in Senate Russell Building Room 379 A meeting with Dr. Von
Eschenbach to discuss Plan B. Please tell me this will work for your schedule?

Alana

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Tuesday, February 28, 2006 4:51 PM
**To:** Crim, Carol H; Weinstein, Alana (Enzi)
**Subject:** RE: Meeting
**Importance:** High

04/20/2007 12:36 FAX 202 646 5199          JUDICIAL WATCH, INC.                    ☑010

Alana,

These are the dates/times presently available on Dr. von Eschenbach's calendar. I will do my best to hold fast to them but will let you know if I need to release some of the time as we progress into March.

March 7 – 1:30 or after

March 8 – between 1:30 and 4:00

March 10 – 11 or after

March 13 – between 9:30 & noon

March 16 – between 1 & 4

March 20 – 3:30 or after

March 22 – between 11 & 4

March 24 – between 2 & 4:30

March 27 – between 2 & 4:30

Thanks,

Carol

——Original Message——
**From:** Crim, Carol H
**Sent:** Tuesday, February 28, 2006 2:31 PM
**To:** 'Weinstein, Alana (Enzi)'
**Subject:** RE: Meeting

Of course...

——Original Message——
**From:** Weinstein, Alana (Enzi)
[mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Tuesday, February 28, 2006 2:16 PM
**To:** Crim, Carol H
**Subject:** RE: Meeting

Carol,

Thank you can you send me dates after March 10th that Dr. Von Eschenbach will be available as I need to coordinate this meeting with Senator Murray and Senator Clinton as well.

Thank you,

Alana

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Tuesday, February 28, 2006 2:12 PM

04/20/2007 12:36 FAX 202 646 5199     JUDICIAL WATCH, INC.     ☑011

**To:** Crim, Carol H; Weinstein, Alana (Enzi)
**Subject:** RE: Meeting
**Importance:** High

Hello Alana,

This email is in followup to the message I just left on your voice mail system. I need to let you know that March 3 and March 6 are no longer viable dates for a meeting between Senator Enzi and Dr. von Eschenbach. **March 7, 8 and 10 during the times listed below remain very good.**

Thank you,

Carol Crim

301-827-3452

-----Original Message-----
**From:** Crim, Carol H
**Sent:** Friday, February 17, 2006 6:36 PM
**To:** 'Weinstein, Alana (Enzi)'
**Subject:** RE: Meeting
**Importance:** High

Hello Alana,

These dates/times work well for Dr. von Eschenbach...

Friday, March 3 — 1:30 p.m. or after

Monday, March 6 — 3:30 p.m. or after

Tuesday, March 7 — 1:30 p.m. or after

Wednesday, March 8 -- between 1:30 and 4:00 p.m.

Friday, March 10 -- 11 a.m. or after

If none of the above work for the Senator's schedule, I will gladly revisit Dr. von Eschenbach's calendar.

Thank you,

Carol Crim

301-827-3452

-----Original Message-----
**From:** Weinstein, Alana (Enzi)
[mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Friday, February 17, 2006 4:47 PM
**To:** Crim, Carol H
**Subject:** Meeting

Carol,

Good afternoon. I am trying to set up a meeting between

Senator Enzi and Dr. Von Eschenbach. Can you give me a few dates in march that would work on the Dr.'s schedule?

Thank you,

Alana Weinstein

Alana Weinstein

Scheduler

Senator Mike Enzi

(202) 224-3424 - Phone

(202) 228-0359 - Fax

Please visit http://www.enzi.senate.gov for more information about Senator Enzi and Wyoming.

04/20/2007 12:36 FAX 202 646 5199          JUDICIAL WATCH, INC.                          ☑013

| | |
|---|---|
| **Subject:** | Meeting w/Senators Enzi/Clinton/Murray w/PRonan — + Courtesy meeting on AvE FDA nomination |
| **Location:** | Room 379-A Russell Senate Office Bldg |
| **Start:** | Tue 3/28/2006 5:30 PM |
| **End:** | Tue 3/28/2006 6:30 PM |
| **Recurrence:** | (none) |

contact: Alana Weinstein 3/10, 202-224-3424; contact for courtesy meeting: Craig Burton on 3/22

**From:** Burton, Craig (OS)
**Sent:** Wednesday, March 22, 2006 7:02 PM
**To:** Sheehy, Janice; Crim, Carol H; Burton, Craig (OS); Boyer, David
**Subject:** Courtesy meeting AvE---FDA Nomination w/Enzi;Clinton;Murray

When: Tuesday, March 28, 2006 4:30 PM-5:30 PM (GMT-05:00) Eastern Time (US & Canada).
Where: SR-379A

▪_▪_▪_▪_▪_▪_▪_▪_▪_▪_▪_▪

Andrew Eschenbauch

-—-Original Message-—-
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Friday, March 10, 2006 2:54 PM
**To:** Crim, Carol H
**Subject:** RE: Rescheduling of meeting between Senators Enzi, Clinton and Mu rray and Dr. Andrew von Eschenbach

We are confirmed for March 28th at 4:30 PM same location Russell Senate Office Building Room 379-A.

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Friday, March 10, 2006 11:12 AM
**To:** Weinstein, Alana (Enzi)
**Subject:** RE: Rescheduling of meeting between Senators Enzi, Clinton and Mu rray and Dr. Andrew von Eschenbach
**Importance:** High

Alana,

Thursday, March 30, is a potential hearing date for us. Maybe morning, maybe afternoon, maybe not until the following week.

That said, I think we'd be safe in offering up some time late afternoon - 4 or after. What I truly don't want to happen is we set on a time and then have to change it.

I will certainly look at the week of April 3, if you think it best.

04/20/2007 12:36 FAX 202 646 5199          JUDICIAL WATCH, INC.                                    ☐014

Thanks,

Carol

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Friday, March 10, 2006 10:41 AM
**To:** Crim, Carol H
**Subject:** RE: Rescheduling of meeting between Senators Enzi, Clinton and Murray and Dr. Andrew von Eschenbach

Carol, is Thursday an optional day to schedule? We are going to need more dates. Too many conflicts.

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Thursday, March 09, 2006 11:44 AM
**To:** Weinstein, Alana (Enzi)
**Subject:** Rescheduling of meeting between Senators Enzi, Clinton and Murray and Dr. Andrew von Eschenbach
**Importance:** High

Alana~

In reference to our phone conversation this morning concerning finding a mutually convenient date for the rescheduling of this meeting sometime during the week of March 27, 2006, I offer the following...

March 28 -- until 11 a.m. or after 2:30 p.m.
March 29 -- after 2:30 p.m.
March 31 -- after 1:00 p.m.

I may be able to offer some time on March 30 -- but it's totally dependent on outside factors over which I have no control. I will definitely let you know as soon as I know -- if we haven't rescheduled by then.

Again, let me say I truly appreciate your understanding and willingness to work with me to quickly establish a new meeting date.

Best regards,
Carol
301-827-3452

# Exhibit C

JUDICIAL WATCH INC                                04/20/2007
DERONDA GROTHE
501 SCHOOL ST SW STE 500                          In Reply refer to:
WASHINGTON  DC  20024                             2007-4204

                                                  Your reference:


Dear Requester:

The Food and Drug Administration (FDA) has received your Freedom of Information Act
(FOIA) request for records regarding:

    PLAN B (LEVEONORGESTREL) - SENATOR PATTY MURRAY CORR

We will respond as soon as possible and may charge you a fee for processing your
request.  If you have any questions about your request, please call Brenda A. Dorsey,
Information Technician,  at (301) 827-6549 or write to us at:

            Food and Drug Administration
            Division of Freedom of Information
            5600 Fishers Lane, HFI-35
            Rockville, MD 20857

If you call or write, use the reference number above which will help us to answer your
questions more quickly.

# Exhibit D

JUDICIAL WATCH INC                                      04/23/2007
DERONDA GROTHE
501 SCHOOL ST SW STE 500                               In Reply refer to:
WASHINGTON  DC  20024                                  2007-4257

Your reference:


Dear Requester:

The Food and Drug Administration (FDA) has received your Freedom of Information Act
(FOIA) request for records regarding:

     PLAN B (LEVONORGESTREL) - SENATOR MICHAEL ENZI  CORR

We will respond as soon as possible and may charge you a fee for processing your
request.  If you have any questions about your request, please call Brenda A. Dorsey,
Information Technician,  at (301) 827-6549 or write to us at:

     Food and Drug Administration
     Division of Freedom of Information
     5600 Fishers Lane, HFI-35
     Rockville, MD 20857

If you call or write, use the reference number above which will help us to answer your
questions more quickly.

# Exhibit E



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville MD 20857

JUL 1 0 2007

Ms. Deronda Grothe
Judicial Watch, Inc.
501 School Street, S.W.
Suite 500
Washington, D.C. 20024

Dear Ms. Grothe:                                      Re: FOIA Request No. 2007-4204

I write on behalf of the United States Food and Drug Administration (FDA) in response to
your Freedom of Information (FOI) request dated April 20, 2007, for communications and
correspondence between FDA and Senator Patty Murray, her office, agents and
representatives, regarding .75 levonorgestrel, sold as Plan B.  Enclosed are the FDA records
that we have located that respond to your request.

As you may be aware, FDA currently has a significant backlog of FOI requests.  Courts have
recognized that this backlog is a regrettable but unavoidable consequence of the abundance of
FOI requests received by FDA and the limited resources available to FDA for responding to
such requests.  Nevertheless, because your request was processed in the track for less
cumbersome requests, we are able to respond at this time.  There will be no charge for this
search.

If you have any questions regarding this response, please do not hesitate to contact us in
writing using the above reference number.

Sincerely,

Lisa C. Granger
Supv. Congressional Analyst
Office of Legislation

Enclosures

# AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS FOR 2006

# HEARINGS

BEFORE A

## SUBCOMMITTEE OF THE

## COMMITTEE ON APPROPRIATIONS

## HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

FIRST SESSION

SUBCOMMITTEE ON AGRICULTURE, RURAL DEVELOPMENT, FOOD AND
DRUG ADMINISTRATION, AND RELATED AGENCIES

**HENRY BONILLA, Texas,** *Chairman*

JACK KINGSTON, Georgia
TOM LATHAM, Iowa
JO ANN EMERSON, Missouri
VIRGIL H. GOODE, Jr., Virginia
RAY LAHOOD, Illinois
JOHN T. DOOLITTLE, California
RODNEY ALEXANDER, Louisiana

ROSA L. DeLAURO, Connecticut
MAURICE D. HINCHEY, New York
SAM FARR, California
ALLEN BOYD, Florida
MARCY KAPTUR, Ohio

NOTE: Under Committee Rules, Mr. Lewis, as Chairman of the Full Committee, and Mr. Obey, as Ranking
Minority Member of the Full Committee, are authorized to sit as Members of all Subcommittees.

MARTIN P. DELGADO, MAUREEN HOLOHAN, LESLIE BARRACK, and JAMIE SWAFFORD,
*Staff Assistants*

## PART 7

| | Page |
|---|---|
| Food and Drug Administration | 1 |
| Farm Credit Administration | 809 |
| Commodity Futures Trading Commission | 857 |



769

Ms. DeLauro: How much, in total, has FDA awarded in bonuses from January 1, 2003 to the date of receipt of this question?

Response: From January 1, 2003 to April 16, 2005, the FDA awarded $19,674,855 in bonuses to Civilian employees.

Ms. DeLauro: Please list any meetings attended by Dr. Steven Galson or any other official at or above his level in the agency (or any conference calls involving any of these officials) with any person other than an FDA employee or an employee of Barr Laboratories, at which the application by Barr for OTC status for Plan B was discuss Please give dates and a full list of participants at such meetings.

Response: Dr. Galson met with GAO representatives on February 23, 2005 to discuss the OTC status for Plan B. The participants from GAO were Marty Gahart, Robert Copeland, Deborah Miller, and Gay Hee Lee.

Dr. Crawford and Dr. Galson briefed Senator Murray, Senator Clinton, and Sena Kennedy on Plan B on April 6, 2005.

Ms. DeLauro: Page 436 of the 2006 budget shows that FDA contributed $1,002,895 in 2004 for activities of the Office of Global Health Affairs at HHS. Please respond to the following questions: what the basis is for this contribution (e.g., MOU) and provide a copy of any document describing the basis for the contribution;

by what method the amount of the FDA contribution is determined;

what the payments were/are/will be for FY 2002, 2003, 2005, and 2006; and whether the FDA funding supports specific activities of that office (and if so, what they are) or whether the funds support only general activities.

If you need to consult with HHS to answer any of the questions, please do so and please provide the information you receive. Please **do not** respond that the question needs to be redirected to HHS.

Response: A reimbursable agreement provided by the Office of Global Affairs is the basis for our contribution.

The agreement had the FDA costs listed, but there was no backup methodology to show the basis for the specific cost.

Payments were $1,036,604 in FY 2002; and $973,685 in FY 2003. The current agreement for FY 2005 is $1,050,150. The FY 05/06 estimates for the Contract is being negotiated.

There are no specific activities mentioned, but rather the agreement states: "... for services in support of FY 2004 bilateral and multilateral activities..."

Ms. DeLauro: The 2006 budget does not include a request for funds to fully fund the required increases in pay costs, leading the agency to estimate it would have 251 fewer non-user-fee-funded FTEs in FY 2006 than in FY 2005, as shown on page 370 of the budget document. What increase in funding would be required to assure that budget authority funded FTEs in 2006 remained at the 2005 level?

Response: Costs of the pay increase will be addressed within the FDA total. FDA will work to ensure that FTE levels in FY 2006 will be sufficient to carry out the agencies mission and protect the public health.

07/08/2004 16:24 FDA 202 xxx xxxx

# United States Senate
### WASHINGTON, DC 20510

July 8, 2004

Steven Galson, M.D.                      Lester M. Crawford, Ph.D
Acting Director                          Acting Commissioner
Federal Drug Administration              Federal Drug Administration
Center for Drug Evaluation and Research  5600 Fishers Lane
5600 Fishers Lane                        Rockville, Maryland 20857
Rockville, Maryland 20857

Dear Dr. Galson and Dr. Crawford

    Recent press reports indicate that the scientists responsible for determining the safety and efficacy of Plan B recommended strongly that Barr Laboratories application for the over-the-counter status be approved. In fact, reports based on internal Federal Drug Administration (FDA) documents seem to imply that the major reasons given for rejecting the application were resoundingly rejected by the scientists responsible for analyzing the data.

    We are deeply concerned that political concerns overrode scientific evidence in this process, a state of affairs that sets a dangerous precedent for all Americans' health.

    Therefore, as members of the Senate Health, Education, Labor, and Pensions Committee, with oversight responsibilities over the Food and Drug Administration, we would like to invite you to meet with us for a forthright, and hopefully, productive conversation about this situation.

    Our staff will be in touch with your office to schedule a time that is mutually agreeable.

Sincerely,

Hillary Rodham Clinton                   Ted Kennedy

Tom Harkin                               Barbara A. Mikulski

07/08/2004 12:24 FAX 202 224 1560    SENATOR CLINTON

Page 2

**Galson, Steven**

| | |
|---|---|
| Subject: | Senate Briefing - Plan B |
| Location: | Russell Senate Office Building/Room 161 |
| Start: | Wed 4/6/2005 4:30 PM |
| End: | Wed 4/6/2005 5:00 PM |
| Recurrence: | (none) |
| Meeting Status: | Meeting organizer |
| Required Attendees: | Hess, Maureen |

contact: Maureen Hess

Meet Dr. Crawford and Pat Ronan there,

**Galson, Steven**

Subject:            Greenwood/Plan B
Location:           Rayburn 2436 4th floor

Start:              Wed 6/2/2004 11:30 AM
End:                Wed 6/2/2004 1:30 PM

Recurrence:         (none)

Patrick Ronan

07/08/2004 12:24 FAX 202 224 2004

# United States Senate
## WASHINGTON, DC 20510

July 8, 2004

Steven Galson, M.D.  
Acting Director  
Federal Drug Administration  
Center for Drug Evaluation and Research  
5600 Fishers Lane  
Rockville, Maryland 20857

Lester M. Crawford, Ph.D  
Acting Commissioner  
Federal Drug Administration  
5600 Fishers Lane  
Rockville, Maryland 20857

Dear Dr. Galson and Dr. Crawford

Recent press reports indicate that the scientists responsible for determining the safety and efficacy of Plan B recommended strongly that Barr Laboratories application for the over-the-counter status be approved. In fact, reports based on internal Federal Drug Administration (FDA) documents seem to imply that the major reasons given for rejecting the application were resoundingly rejected by the scientists responsible for analyzing the data.

We are deeply concerned that political concerns overrode scientific evidence in this process, a state of affairs that sets a dangerous precedent for all Americans' health.

Therefore, as members of the Senate Health, Education, Labor, and Pensions Committee, with oversight responsibilities over the Food and Drug Administration, we would like to invite you to meet with us for a forthright, and hopefully, productive conversation about this situation.

Our staff will be in touch with your office to schedule a time that is mutually agreeable.

Sincerely,

Hillary Rodham Clinton

Ted Kennedy

Tom Harkin

Barbara A. Mikulski

07/08/2004 12:24 FAX 202 224 1560          SENATOR CLINTON

Page 2

07/08/2004 12:22 FAX 202 224 1560     SENATOR CLINTON     ☒001

# United States Senate
## WASHINGTON, DC 20510

July 8, 2004

Steven Galson, M.D.                     Lester M. Crawford, Ph.D
Acting Director                         Acting Commissioner
Federal Drug Administration             Federal Drug Administration
Center for Drug Evaluation and Research 5600 Fishers Lane
5600 Fishers Lane                       Rockville, Maryland 20857
Rockville, Maryland 20857

Dear Dr. Galson and Dr. Crawford

   Recent press reports indicate that the scientists responsible for determining the safety
and efficacy of Plan B recommended strongly that Barr Laboratories application for the over-the-
counter status be approved. In fact, reports based on internal Federal Drug Administration
(FDA) documents seem to imply that the major reasons given for rejecting the application were
resoundingly rejected by the scientists responsible for analyzing the data.

   We are deeply concerned that political concerns overrode scientific evidence in this
process, a state of affairs that sets a dangerous precedent for all Americans' health.

   Therefore, as members of the Senate Health, Education, Labor, and Pensions Committee,
with oversight responsibilities over the Food and Drug Administration, we would like to invite
you to meet with us for a forthright, and hopefully, productive conversation about this situation.

   Our staff will be in touch with your office to schedule a time that is mutually agreeable.

                                        Sincerely,

Hillary Rodham Clinton                  Ted Kennedy

Tom Harkin                              Barbara A. Mikulski

04-3815

Page 2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

                                                            Food and Drug Administration
                                                            Rockville MD 20857


The Honorable Patty Murray
United States Senate                        APR 1 3 2004
Washington, D.C. 20510-0704

Dear Senator Murray:

Thank you for the letter of March 11, 2004, regarding the supplemental new drug application
(NDA) for the change of status from prescription to over-the-counter (OTC) for the drug, Plan B,
also known as the "morning-after" pill. Your letter was co-signed by two of your colleagues.
The NDA originally was filed by Women's Capital Corporation, which since was acquired by
Barr Laboratories in the fall of 2003.

Since the December 16, 2003, joint meeting of two Food and Drug Administration (FDA)
advisory committees to review the Plan B application, the sponsor of the supplemental NDA
submitted additional information to FDA in support of the application. This additional
information was extensive enough to qualify as a major amendment to the NDA. Under the
terms of the Prescription Drug User Fee Act (PDUFA), major amendments such as this
automatically trigger a 90-day extension of the original PDUFA deadline. Such extensions are
required so that FDA staff have adequate time to review the additional material. FDA will take
into account this new information and all of the discussion by the advisory committees as we
continue our review of this application.

Thank you for your interest in this matter. If we can be of further assistance, please let us know.
An identical letter has been sent to your co-signers.

                                    Sincerely,

                                    Patrick O. McGarey
                                    Legislative Director
                                    Office of Legislation

# United States Senate
### WASHINGTON, DC 20510

March 11, 2004

Commissioner Mark McClellan
Food and Drug Administration
14-71 Parklawn Building
5600 Fishers Lane
Rockville, MD 20857

Dear Commissioner McClellan:

Before you move on to your next challenge, we request that you make one more decision that upholds the credibility and integrity of the Food and Drug Administration, which you have so ably led. We believe it is important, in your current capacity as FDA Administrator, to make a decision on the Plan B over-the-counter (OTC) application based solely on the scientific evidence and the benefits for women's health and well-being. Otherwise, we are concerned that the final decision could be influenced more by politics than by science.

As you know, after a thorough review of the application, the Advisory Committee overwhelmingly recommended approval of the application based on the available scientific evidence that indicates Plan B meets the FDA's criteria for over-the-counter products. The body of available evidence demonstrates that Plan B is safe and effective and that women can use the product as needed and as directed, without a diagnosis or supervision from a health care provider. Contrary to concerns that some have raised, existing evidence does not support the claim that women will misuse this product if it is available without a prescription.

Approximately three million unintended pregnancies occur annually in the United States and more than half of these unintended pregnancies happen to women using a regular method of contraception. Unintended pregnancy is a major public health problem. But we can effectively address this issue by increasing the use of EC, which could reduce unintended pregnancies by half, thereby greatly reducing abortions.

One of the most compelling facts about emergency contraception is that it is most effective in preventing pregnancy the sooner a woman can take it. If taken within 72 hours of intercourse, emergency contraception can reduce the risk of pregnancy by at least 75%. In fact, Plan B® has been shown to be 95 percent effective if taken within 24 hours of intercourse. For every 12-hour delay, studies show that effectiveness declines by 50 percent. This gives women a relatively short timeframe in which to locate and contact a provider to prescribe the pills and to find a pharmacist to fill the prescription. Any delay increases the chance of pregnancy.

A second compelling fact is that women have difficulty gaining access to physicians to obtain a prescription within the critical window of time when EC works most effectively. Prescription-only status is a barrier that contributes to more negative outcomes, and more unintended pregnancies.

The history of the FDA's commitment to base its decisions solely on scientific evidence regarding safety and efficacy – not politics – has instilled confidence in the American public that the agency's decisions are in the best interests of the public health. As a result, we have yielded significant advances in our knowledge and ability to advance the overall health and well-being of Americans. We hope you will act on the Plan B application before your departure with a decision consistent with the scientific evidence and public health benefit that this safe and effective product affords women.

Sincerely,

cc:     Acting Commissioner Lester Crawford
        Food and Drug Administration

        Secretary Tommy Thompson
        Department of Health and Human Services

# United States Senate
### WASHINGTON, DC 20510

TO:     Commissioner Mark McClellan
        ATTN: Legislative Affairs

FAX:    301-827-3793

DATE:   March 12, 2004

PAGES:  3

04-1672

FDCH TRANSCRIPTS
Congressional Hearings
Mar. 17, 2005

# Senate Health, Education, Labor and Pensions Committee Holds Hearing on Nomination of Lester Crawford to be FDA Commissioner

## LIST OF SPEAKERS

ENZI:

Good morning, and welcome to the confirmation hearing for Dr. Lester M. Crawford to be the commissioner of the Food and Drug Administration.

Recently when we met, it became obvious of our shared commitment to protect and advance America's health. Clearly we have a lot of work to do together.

Dr. Crawford, the FDA is no stranger to you. In fact, over the last 30 years, you've been at the FDA four times, twice serving at the helm of the agency already.

Next year will mark the 100th anniversary of the landmark legislation that ushered the FDA into the modern era. This is truly a historical milestone and a dramatic time for you to take up the reins of the agency.

Back then, 100 years ago, there was a controversy, similar to today's drug controversy, that spurred the FDA's dramatic growth from a chemist at the Department of Agriculture to the full-fledged agency it is today.

Back then it was a crisis in food safety. Today, it's a concern with drug safety. The FDA weathered the previous storm. It'll handle this one, too, with the same kind of talent, diligence and hard work that solve the previous one.

You'll face some tough questions today, but I want to let you know that we'll be asking these questions so that we can be sure the man chosen by President Bush to head the FDA at this critical juncture in its history is up to the task.

The FDA has a very broad and critical mission in protecting the public health. You'll be in charge of an agency that regulates $1 trillion worth of products a year. The FDA ensures the safety and effectiveness of all drugs, biological products such as vaccines, medical devices and animal drugs and feed.

It also oversees the safety of the vast variety of food products, as well as medical and consumer products including cosmetics.

As commissioner of the FDA, you'll be responsible for advancing the public health by helping to speed innovations in its mission areas and by helping the public get accurate, science-based information on medicines and foods.

The FDA has been without a confirmed commissioner for over a year. You've been picking up the reins during that time and pulling it through.

Earlier this year, 17 members of this committee sent a letter to the president, urging him to nominate a commissioner to provide the agency with greater clarity and certainty in its mission to protect our food and drug supplies.

So within that context, I just want to follow up on a comment that was made earlier in this committee on RU-486. RU-486 is not about ending lives. It's about protecting women's health, and in fact, FDA has approved this drug as safe and effective. Is that not correct?

CRAWFORD:

That is correct.

MURRAY:

Thank you. I just want that for the record.

Now on the emergency contraceptives, plan B emergency contraceptives, I heard you say that this is unusual. You have a panel that has recommended 24 to three to approve this. I know you said a court filing has been made, but what is unusual? Are there other times that 24 to three, and it's not approved?

CRAWFORD:

Yes, there have been times when we've overturned the advisory committee.

I think it's important for me to state that we have a decision pending with respect to the product you asked about. And we're moving forward.

What is unusual is the kind of application that the company has filed with us.

MURRAY:

In what way?

CRAWFORD:

I really not supposed to discuss what they have filed, but it's complex and it has never been done before, so it's taking us a little bit longer.

And I'm not saying we're going to deny it. We are moving towards a decision. But it is a unique application.

MURRAY:

You may or may not know, but Washington state is one of the four states that currently have over-the-counter agreement on emergency contraceptives.

It's based on good science. It's based on good public health police. It allows consumers to make their own decisions. And I frankly think that is part of what we need to do to make sure that FDA is something that all of us have confidence in: that it's not political decisions. It is based on good public health and good science.

So I just want to ask you, you said that a decision is coming, a decision is coming. Will this committee know, by the time we vote on your confirmation, I believe it's April 13th, either what that decision is or an exact time line of when that decision will be made?

CRAWFORD:

I can't commit to that.

MURRAY:

Well, I find that troubling, because this is an issue that is extremely important. I think many of us on this committee care deeply that FDA make decisions based on good science, good public health policy and that troubles me greatly that we won't have that answer.

(UNKNOWN)

Would the gentlelady yield? Perhaps I wonder if Dr. Crawford could share, he can't say this at a hearing. Could he say this at a briefing, perhaps with you and I and Senator Clinton and the leadership of the committee?

CRAWFORD:

Yes, I'd be happy to meet with you.

MURRAY:

Well, then I would request that we have that time and that briefing before this committee votes on this nomination. If I could ask the chairman for his approval of that.

ENZI:

We'll work on that.

MURRAY:

OK, and I think there are a number of us who...

(CROSSTALK)

ENZI:

We will work on making that happen, if we have a little bit of time to.

MURRAY:

I appreciate that.

ENZI:

And we have a number of people to get together. I hope we're not counting on all of them being there all at the same time, if that's what presents the difficulty.

MURRAY:

I think we're asking for a specific briefing by Dr. Crawford before this committee votes on his nomination to give us the reason why he believes that the request on the plan B emergency contraceptive is unusual.

(UNKNOWN)

And the relevant people would be Senator Clinton, you and I, the leadership of the committee, if it wishes to participate, and of course your staff being present.

ENZI:

Certainly. The point that I'm making, though, is that, if we have to coordinate all of those people to be at the same place at the same time, as opposed to setting up the time.

MURRAY:

We'll be there.

ENZI:

OK.

MURRAY:

All right. We will work on that with you. I have other questions I'll submit for the record and I thank the chairman.

ENZI:

Thank you.

Senator Hatch?

HATCH:

Dr. Crawford, welcome to the committee. Congratulations on this nomination. I've been around here a long time and watched all kinds of FDA commissioners come through and I have to say, you're as qualified as anybody who's ever been nominated for this position.

And I know that you've done an excellent job during the time that you have been there as acting, but also in other capacities as well. So I'm grateful for your willingness to serve and expect you to be a great chairman.

And I look forward to working with you on a wide variety of issues, including drug safety, Hatch-Waxman Reform, (inaudible), the White Oak Facility which, of course I take a great interest in, as you know, and so many other issues.

And I agree with those who have spoken for you and have mentioned your integrity, your capacity, the background, the education, and all the things that you have that would add, I think, a great deal to this position.

Let me just ask you this: Would you please take just a few minutes to talk about your plan to ensure the safety of our food supply against bioterrorist threats?

CRAWFORD:

Thank you, Senator. We were blessed, when I came on board in 2002, with the fact that the Bioterrorism Act, which I know you and other members worked on, was about to be passed.

The president signed it into law in June of that year, and we immediately went to the four regulations that implemented that law. They are now, I'm happy to report, all in place.

For the first time in its history, FDA has a thoroughly effective legislative authority to protect the food supply. We deployed a number of our inspectors in specific areas. At the time of the passage of the law, we were only at 35 ports of entry. We're now at basically half of them which is well over 100.

And we are also able to order companies to tell us when they're having food come into the United States. We're also able to bar them, to prevent them from entering. We can condemn the food. We have a very strong food safety net, both domestically and internally, and I think the proof of the pie is in the pudding.

S. Hrg. 109–99

# NOMINATION OF LESTER M. CRAWFORD

# HEARING

OF THE

## COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS
## UNITED STATES SENATE

ONE HUNDRED NINTH CONGRESS

FIRST SESSION

ON

TO BE COMMISSIONER, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

MARCH 17, 2005

Printed for the use of the Committee on Health, Education, Labor, and Pensions



U.S. GOVERNMENT PRINTING OFFICE

20–167 PDF          WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail Stop SSOP, Washington, DC 20402–0001

18

available. However, we have insisted that they be FDA approved, and the fact that they go through an abbreviated approval process also means that the Best Pharmaceuticals for Children Act and so forth will be applicable. So we will try to use that mechanism to make sure it works.

Senator DEWINE. Doctor, you are looking at the—you have been looking at the issue of salt in what is called healthy food products. When could we expect those guidelines, or what are you doing in that area?

Dr. CRAWFORD. Essentially, what has happened there is that we gave the industry, that is the food industry, a grace period of 6 years to try to reformulate the products that they would be drastically reducing the salt content of so that they would be palatable and also that they would be at the same nutrition level.

The industry has had a hard time doing that, and yet we have some notable brands that have materially reduced the salt. We think that is good for public health. We don't want to in any sense invalidate those procedures, what they have done, and the progress that has been made, so we are considering now the finalization of a regulation which will enable them to label correctly and also to proceed with those efforts.

That will be done sometime this summer, but there has been some concern that we might take action against companies in the salt area. I assure you that we are working with them. If there is too much salt, we will also be working with them. But those that are genuinely trying to reduce the salt and maintain the nutrition level, we will have a place for them.

Senator DEWINE. But something will happen this summer?

Dr. CRAWFORD. Yes.

Senator DEWINE. Thank you, Mr. Chairman.

The CHAIRMAN. Thank you. Senator Murray.

Senator MURRAY. Thank you, Mr. Chairman, and first, let me commend Senator DeWine for his work on pediatric labeling. I share his concern and agree with him that we need to really make sure we are moving forward on that.

Dr. Crawford, thank you for coming before this committee at a very troubling time for FDA, where across this country, we are seeing allegations of safety lapses, of political interference, conflict of interest. It is extremely important that FDA's reputation remain sterling and that the public can count on FDA to give us the best scientific information and approve drugs and let consumers make decisions for themselves, and we have heard that on this committee many times as we have had discussions about safety over the last several weeks, on the COX-2 drugs, for example, that patients need to know about the drug, but they need to have the right to make decisions about it themselves.

So within that context, I just want to follow up on a comment that was made earlier on this committee on RU-486. RU-486 is not about ending life, it is about protecting women's health, and, in fact, FDA has approved this drug as safe and effective, is that not correct?

Dr. CRAWFORD. That is correct.

Senator MURRAY. Thank you. I just want that for the record.

18

, we have insisted that they be FDA approved,
ey go through an abbreviated approval process
: Best Pharmaceuticals for Children Act and so
able. So we will try to use that mechanism to

Doctor, you are looking at the—you have been
of salt in what is called healthy food products.
.ect those guidelines, or what are you doing in

ssentially, what has happened there is that we
that is the food industry, a grace period of 6
rmulate the products that they would be dras-
salt content of so that they would be palatable
vould be at the same nutrition level.
had a hard time doing that, and yet we have
is that have materially reduced the salt. We
or public health. We don't want to in any sense
cedures, what they have done, and the progress
:, so we are considering now the finalization of
will enable them to label correctly and also to
fforts.
e sometime this summer, but there has been
we might take action against companies in the
you that we are working with them. If there is
vill also be working with them. But those that
: to reduce the salt and maintain the nutrition
place for them.
But something will happen this summer?
:s.
Thank you, Mr. Chairman.
iank you. Senator Murray.
Thank you, Mr. Chairman, and first, let me
)eWine for his work on pediatric labeling. I
id agree with him that we need to really make
forward on that.
nk you for coming before this committee at a
for FDA, where across this country, we are see-
.fety lapses, of political interference, conflict of
mely important that FDA's reputation remain
e public can count on FDA to give us the best
n and approve drugs and let consumers make
lves, and we have heard that on this committee
.ave had discussions about safety over the last
e COX-2 drugs, for example, that patients need
lrug, but they need to have the right to make
emselves.
ntext, I just want to follow up on a comment
er on this committee on RU-486. RU-486 is not
: is about protecting women's health, and, in
ved this drug as safe and effective, is that not

at is correct.
Thank you. I just want that for the record. ˙ᴵᴮ

19

Now, on the emergency contraceptives, Plan B and emergency
contraceptives, I heard you say that this is unusual. You have a
panel that has recommended 24 to 3 to approve this. I know you
said a court filing has been made, but what is unusual? Are there
other times that it's 24 to 3 and it is not approved?
Dr. CRAWFORD. Yes. There have been times when we have over-
turned the Advisory Committee. I think it is important for me to
state that we have a decision pending with respect to the product
you asked about and we are moving forward. What is unusual is
the kind of application that the company has filed with us——
Senator MURRAY. In what way?
Dr. CRAWFORD. I can't—I am really not supposed to discuss what
they have filed, but it is complex and it has never been done before,
so it is taking us a little longer. I am not saying we are going to
deny it, but we are moving toward a decision. But it is a unique
application.
Senator MURRAY. You may or may not know, but Washington
State is one of the four States that currently have an over-the-
counter agreement on emergency contraceptives. It is based on
good science. It is based on good public health policy. It allows con-
sumers to make their own decisions. And I, frankly, think that is
part of what we need to do to make sure that FDA is something
that all of us have confidence in, that it is not political decisions,
it is based on good health, good public health, and good science.
So I just want to ask you, you said that a decision is coming, a
decision is coming. Will this committee know by the time we vote
on your confirmation—I believe it is April 13—either what that de-
cision is or an exact time line of when that decision will be made?
Dr. CRAWFORD. I can't commit to that.
Senator MURRAY. Well, I find that troubling because this is an
issue that is extremely important. I think many of us on this com-
mittee care deeply that FDA make decisions based on good science,
good public health policy, and that troubles me greatly that we
won't have that answer.
Senator MIKULSKI. Would the gentlelady yield? Perhaps, I won-
der if Dr. Crawford could share—he can't say this at a hearing.
Could he say this at a briefing, perhaps with you and I and Sen-
ator Clinton and the leadership of the committee?
Dr. CRAWFORD. Yes. I would be happy to meet with you.
Senator MURRAY. Then I would request that we have that time
and that briefing before this committee votes on this nomination,
if I could ask the chairman for his approval of that.
The CHAIRMAN. We will work on that.
Senator MURRAY. OK, and I think there are a number of us who
would like to——
The CHAIRMAN. We will work on having that happen. We have
a little bit of time to——
Senator MURRAY. I appreciate that.
The CHAIRMAN. We have a number of people to get together. I
hope we are not counting on all of them being there all at the same
time, if that is what presents the difficulty.
Senator MURRAY. I think we are asking for a specific briefing
from Dr. Crawford before this committee votes on his nomination

20

to give us the reason why he believes that the request on the Plan B emergency contraceptives is unusual.

Senator MIKULSKI. And the relevant people will be Senator Clinton, you and I, the leadership of the committee if it wishes to participate, and, of course, your staff being present, Senator.

The CHAIRMAN. Certainly. The point that I am making, though, is that if we have to coordinate all of those people to be at the same place at the same time——

Senator MIKULSKI. We will be there.

Senator MURRAY. We will be there.

The CHAIRMAN. [continuing]. As opposed to setting up a time——

Senator MURRAY. You tell us the time.

The CHAIRMAN. OK.

Senator MURRAY. All right. We will work on that with you. I have other questions I will submit for the record, and I thank the chairman.

The CHAIRMAN. Thank you. Senator Hatch.

Senator HATCH. Dr. Crawford, welcome to the committee. Congratulations on this nomination. I have been around here a long time and watched all kinds of FDA Commissioners come through. I have to say, you are as qualified as anybody who has ever been nominated for this position. I know that you have done an excellent job during the time that you have been there as Acting Commissioner, but also in other capacities, as well. So I am grateful for your willingness to serve and expect you to be a great Chairman.

I look forward to working with you on a wide variety of issues, including drug safety, Hatch-Waxman reform, DSHEA, the White Oak facility, which, of course, I take a great interest in, as you know, and so many other issues. And I agree with those who have spoken for you and have mentioned your integrity, your capacity, the background, the education, and all the things that you have that would add, I think, a great deal to this position.

Let me just ask you this. Would you please take just a few minutes to talk about your plan to ensure the safety of our food supply against bioterrorist threats?

Dr. CRAWFORD. Thank you, Senator. We were blessed when I came on board in 2002 with the fact that the Bioterrorism Act, which I know you and other members worked on, was about to be passed. The President signed it into law in June of that year and we immediately went to the four regulations that implemented that law. They are now, I am happy to report, are all in place.

For the first time in its history, FDA has a thoroughly effective legislative authority to protect the food supply. We deployed a number of our inspectors in specific areas. At the time of the passage of the law, we were only at 35 ports of entry. We are now at basically half of them, which is well over 100. We are also able to order companies to tell us when they are having food come into the United States. We are also able to debar them, to prevent them from entering. We can condemn the food. We have a very strong food safety net both domestically and internally.

I think the proof of the pie is in the pudding. We have been able to prevent these kinds of attacks and we also are doing a better job at essential food safety, because each time there is a major outbreak of any kind, we ask ourselves first, could this be a terrorist

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

### Senator Murray

**Question 1:  In response to questions at the Senate HELP Committee nomination hearing, you responded to my question about your determination that 18 years of age was the appropriate age restriction for Plan B OTC.  As I pointed out at the hearing, there seems to be a shift at FDA from 16 to 17 now 18 years of age.  However, there does not appear to be any justification for this shift.  Does the agency have additional scientific data showing that young women under 18 could not use Plan B safely and effectively as an OTC product?  What information did you receive that resulted in your determination that 18 was the appropriate age?  Did you consult with the original members of the FDA's Advisory Committee in reaching this decision or did you consult with health care providers that provide care to younger women?**

Answer:  I did not receive any additional scientific data nor did I consult an FDA Advisory Committee in reaching the decision that age 18 was the appropriate age.  Dr. Galson, the Director of the Center for Drug Evaluation and Research, had previously concluded that the sponsor had not established that Plan B could be used safely and effectively without a prescription by young adolescents, women age 16 and younger (i.e. that it was appropriate for OTC use for women age 17 and older).  In considering the difficulty of enforcing an age-based restriction on the availability of this oral hormonal contraceptive, I have concluded that 18 (rather than 17) is the more appropriate cutoff to best promote and protect the public health.  The state-regulated pharmacies that will be dispensing Plan B® under Barr's voluntary Convenient Access, Responsible Education (CARE) program (as well as society as a whole) are more familiar with 18 as a cutoff age.  I understand that in all 50 states, 18 is the age of majority (i.e., the legal delineation between minor and adult), and retail outlets, including pharmacies, are familiar with using 18 as the age of restriction for the sale of certain products.  With regard to the sale of certain drug products, the legal age to purchase FDA-approved non-prescription nicotine replacement therapy products is 18.  Moreover, I understand that as a matter of state law, many products routinely sold by pharmacies, e.g., tobacco products and non-prescription cough-cold products like pseudoephedrine are restricted to consumers 18 and older.  The approach builds on well-established state and private sector infrastructures to restrict certain products to consumers 18 and older.  This approach should, therefore, help ensure safe and effective use of Plan B.

**Question 2:  Based on FDA's decision to place an age restriction on an OTC product due to safety, can we assume that all OTC applications will be considered under these circumstances?  I know that the agency is currently reviewing a weight loss medication OTC application.  Will FDA be requesting data on the safety of this product for younger patients?  Will FDA be reviewing this application to determine how this product may affect behavior?  And, finally will FDA be asking the manufacturer how to ensure that this medication can be taken safely without a physician's supervision?**

Answer:  In any request to switch a prescription product to OTC status, FDA applies the statutory standard and considers available data to determine whether prescription dispensing is "not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

use, and . . . the drug is safe and effective for use in self-medication as directed in proposed labeling.

Such switch applications generally include data from actual use and labeling comprehension studies to demonstrate that the product can be safely and effectively used without the supervision of a practitioner licensed by law to administer the drug. FDA may approve an NDA application only when, among other things, the investigations submitted in the application include adequate tests showing whether or not the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling and when there is sufficient information to determine from the application whether the drug is safe for use. FDA will apply these statutory standards to any switch application submitted to it.

Furthermore, Dr. Galson, the Director, Center for Drug Evaluation and Research, has indicated that he intends to work with FDA's scientific staff to initiate a process to further develop the Agency's understanding about pediatric use of OTC drugs. One of the questions he intends to address will be how to establish the data requirements regarding use patterns in these special age groups in which age is not merely a chronologic deterrent, but also a biologic deterrent.

**Question 3: When FDA approved the original Plan B application for prescription in 1999 as an emergency contraceptive, did the agency request additional data on younger women? Was there a distinction made between the safety and efficacy for women over 18 and women under 18? Was the issue or concern about behavior part of the approval process?**

Answer: FDA did not request additional data on younger women as part of the original approval process for Plan B as a prescription product. Prescription Plan B was reviewed in a manner similar to that for all hormonal contraceptives. Prescription oral contraceptives have been determined to be safe and effective, for all women after they have passed through menarche and are having menstrual cycles, when used following the direction of a healthcare provider. The issue or concern about age was not a significant consideration during the original approval process for prescription Plan B since woman could only obtain the product with a prescription from a healthcare provider. The issue regarding additional data for younger women arose in the sponsor's actual use and labeling comprehension studies submitted to support the switch to OTC, not in the original prescription application.

**Question 4: In the announcement of July 31, 2006, FDA indicated that they would be working with the manufacturer of Plan B to determine appropriate enforcement mechanisms for ensuring that women under 18 did not receive the product as an OTC. How does FDA currently enforce risk management responsibilities?**

Answer: For prescription Plan B, there are no special procedures or responsibilities beyond those normally required for all prescription drug products. In this case, the company proposed to market prescription Plan B and non-prescription Plan B in the same box. Therefore, certain marketing restrictions are appropriate to ensure that Plan B is made available to one population on a prescription basis and another population on a non-prescription basis. Both FDA and manufacturers are involved in ensuring that restrictions on distribution and use are followed. Manufacturers typically submit, as part of their application, a plan to address any marketing

Senator Murray, Page 2

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

restrictions, which often includes, as here, education and monitoring. Enforcement of risk management responsibilities for other products varies depending on the specific drug product.

**As I mentioned at the hearing Accutane has a number of label safety restrictions for women due to the documented risk of miscarriage and birth defects. Women have to prove that they are in fact not pregnant and they are currently using 2 forms of birth control. How does FDA ensure that women under 18 are able to comprehend this labeling restriction and effectively use 2 forms of birth control? I realize this is a prescription medication, but it is taken every day without physician supervision.**

The sponsor's iPLEDGE program for Accutane is aimed at preventing use of the drug during pregnancy. To obtain the drug, in addition to registering with iPLEDGE, patients must comply with a number of key requirements that include completing an informed consent form, obtaining counseling about the risks and requirements for safe use of the drug, and, for women of childbearing age, complying with necessary pregnancy testing. Prescribing physicians, responsible for administering the informed consent, are also responsible for judging their patients' comprehension of the restrictions.

To convey important information about risk-reduction to women of child-bearing potential, iPLEDGE provides the following education materials: the iPLEDGE Patient Introductory Information Brochure, the iPLEDGE Program Isotretinoin Educational Kit for Female Patients who Can Get Pregnant (which includes the Guide to Isotretinoin for Female Patients Who Can Get Pregnant, Birth Control Workbook, Contraception Referral Form and Contraception Counseling Guide, Patient Identification Card, Patient Information and Informed Consent form, and Patient Flowchart), and a Medication Guide.

In addition, the patient, in interacting with the iPLEDGE system, is queried to ensure her understanding of the risks of the drug and the importance of using effective contraception. If there is any suggestion that she does not have a complete understanding, she is not cleared for dispensing of isotretinoin through the system, but is instead referred back to her physician.

**Finally, would Plan B be recommended for women taking this medication as a method of birth control?**

Plan B should not be used as one of the 2 forms of birth control recommended for users of Accutane. Plan B is not approved for routine contraception use. It is only approved for emergency use. Labeling for Plan B (both nonprescription and prescription) does/will not recommend the use of Plan B in conjunction with Accutane.

**Question 5: One of my major concerns about the Plan B OTC application process has been the appearance that political forces, not science have dictated this process. Have you discussed this process or your July 31st announcement with individuals at the White House?**

Answer: I have never discussed the Plan B application process with anyone at the White House.

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

**How many current applications at FDA from drug approvals to medical devices to OTC applications do you personally decide? What is the percentage of decisions issued by FDA regarding food safety, drugs or devices that you personally sign?**

Under the Act, the authority to approve drug and device applications is specifically assigned to the Secretary of Health and Human Services. That authority, in turn, has been delegated to the Commissioner of the FDA and redelegated to the Directors of CDER, CBER, and CDRH. Therefore, it is appropriate for a Commissioner to directly act on a drug or device application. That said, the decision to approve Barr's supplemental new drug application for Plan B was made by CDER. Prior to the Center's decision on the application, I determined that further rulemaking by the Agency was not required to address the unique regulatory issues related to this particular application. I determined this was an appropriate resolution to the Advance Notice of Proposed Rulemaking (ANPRM) process that was put in place by my predecessor. I also determined that 18 was the appropriate age to enforce the partial OTC switch requested by Barr. While I am unaware of any pending applications on which I would make decisions regarding approval, it is customary for a Commissioner to be briefed and updated on high-profile decisions before the Agency, and to exercise his/her authorities when appropriate.

**And, finally it has come to my attention that there are a large number of political appointees now serving the Commissioner's office. Can you please provide to me the current number of political appointees within the FDA and does this number represent an increase or decrease from past Administrations?**

Of the more than 10,000 FDA employees, only five are political appointees, including myself. It is my understanding that this number is generally consistent with past Administrations.

**Question 6: In 2002 and 2003 when we enacted the MDUFMA and the technical corrections legislation, I was very interested in the need to provide additional incentives to improve pediatric labeling of medical devices. As a strong supporter of the Better Pharmaceuticals Act for Children and the FDA Pediatric Rule, I believe we can provide incentives to encourage manufacturers to seek on label approval for pediatric drugs and devices. However, the task of determining the appropriate mechanism for medical devices has proven to be difficult. I recognize the differences between drugs and devices but do believe we can do more to address this inequity. I would be interested in your insights as a practitioner and as the Acting Commissioner on what steps we can take to ensure greater pediatric labeling of medical devices.**

Answer: Labeling devices for pediatric use is of significant interest to FDA, and the Center for Devices and Radiological Health (CDRH) has taken important steps to ensure that devices have pediatric labeling, as needed. It is important to note, however, that although some medical devices are specifically designed for use on infants and children, such as infant incubators and infant radiant warmers, the majority of devices going to market are indicated for the general population. As such, although the labeling does not indicate the device for pediatric use, it does not exclude such use. Because these devices can be used in both the pediatric and adult populations, they are not specifically labeled as pediatric devices.

Senator Murray, Page 4

## Palmer, Kelly

| | |
|---|---|
| **Subject:** | POSTPONED: Meeting w/Senators Enzi/Clinton/Murray |
| **Location:** | Senate Russell Building, Room 379A; contact: Alana Weinstein, 202-224-3424 on 2/28 |
| **Start:** | Thu 3/9/2006 12:00 AM |
| **End:** | Fri 3/10/2006 12:00 AM |
| **Show Time As:** | Free |
| **Recurrence:** | (none) |

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Tuesday, February 28, 2006 5:39 PM
**To:** Crim, Carol H
**Subject:** RE: Meeting

Great we are confirmed. Thank you.

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Tuesday, February 28, 2006 5:38 PM
**To:** Weinstein, Alana (Enzi)
**Subject:** RE: Meeting
**Importance:** High

Alana,

One more time -- with message...

Yes, the date/time will work for Dr. von Eschenbach.

Thanks,

Carol

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Tuesday, February 28, 2006 5:04 PM
**To:** Crim, Carol H
**Subject:** RE: Meeting

Ok, I have all three Senators - Senator Enzi, Senator Clinton, and Senator Murray on board for 5:00 PM meeting on March 9th in Senate Russell Building Room 379 A meeting with Dr. Von Eschenbach to discuss Plan B. Please tell me this will work for your schedule?

Alana

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Tuesday, February 28, 2006 4:51 PM
**To:** Crim, Carol H; Weinstein, Alana (Enzi)
**Subject:** RE: Meeting
**Importance:** High

Alana,

These are the dates/times presently available on Dr. von Eschenbach's calendar. I will do my best to hold fast to them but will let you know if I need to release some of the time as we progress into March.

March 7 -- 1:30 or after

March 8 -- between 1:30 and 4:00

March 10 -- 11 or after

March 13 -- between 9:30 & noon

March 16 -- between 1 & 4

March 20 -- 3:30 or after

March 22 -- between 11 & 4

March 24 -- between 2 & 4:30

March 27 -- between 2 & 4:30

Thanks,

Carol

-----Original Message-----
**From:** Crim, Carol H
**Sent:** Tuesday, February 28, 2006 2:31 PM
**To:** 'Weinstein, Alana (Enzi)'
**Subject:** RE: Meeting

Of course...

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Tuesday, February 28, 2006 2:16 PM
**To:** Crim, Carol H
**Subject:** RE: Meeting

Carol,

Thank you can you send me dates after March 10th that Dr. Von Eschenbach will be available as I need to coordinate this meeting with Senator Murray and Senator Clinton as well.

Thank you,

Alana

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Tuesday, February 28, 2006 2:12 PM
**To:** Crim, Carol H; Weinstein, Alana (Enzi)
**Subject:** RE: Meeting
**Importance:** High

Hello Alana,

This email is in followup to the message I just left on your voice mail system. I need to let you know that March 3 and March 6 are no longer viable dates for a meeting between Senator Enzi and Dr. von Eschenbach. **March 7, 8 and 10 during the times listed below remain very good.**

Thank you,

2

Carol Crim

301-827-3452

-----Original Message-----
**From:** Crim, Carol H
**Sent:** Friday, February 17, 2006 6:36 PM
**To:** 'Weinstein, Alana (Enzi)'
**Subject:** RE: Meeting
**Importance:** High

Hello Alana,

These dates/times work well for Dr. von Eschenbach...

Friday, March 3 -- 1:30 p.m. or after

Monday, March 6 -- 3:30 p.m. or after

Tuesday, March 7 -- 1:30 p.m. or after

Wednesday, March 8 -- between 1:30 and 4:00 p.m.

Friday, March 10 -- 11 a.m. or after

If none of the above work for the Senator's schedule, I will gladly revisit Dr. von
Eschenbach's calendar.

Thank you,

Carol Crim

301-827-3452

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Friday, February 17, 2006 4:47 PM
**To:** Crim, Carol H
**Subject:** Meeting

Carol,

Good afternoon. I am trying to set up a meeting between Senator Enzi and Dr. Von
Eschenbach. Can you give me a few dates in march that would work on the Dr.'s
schedule?

Thank you,

Alana Weinstein

Alana Weinstein

Scheduler

Senator Mike Enzi

(202) 224-3424 - Phone

(202) 228-0359 - Fax

Please visit http://www.enzi.senate.gov for more information about Senator
Enzi and Wyoming.

3

## Palmer, Kelly

| | |
|---|---|
| **Subject:** | Meeting w/Senators Enzi/Clinton/Murray w/PRonan -- + Courtesy meeting on AvE FDA nomination |
| **Location:** | Room 379-A Russell Senate Office Bldg |
| **Start:** | Tue 3/28/2006 5:30 PM |
| **End:** | Tue 3/28/2006 6:30 PM |
| **Recurrence:** | (none) |

contact: Alana Weinstein 3/10, 202-224-3424; contact for courtesy meeting: Craig Burton on 3/22

**From:** Burton, Craig (OS)
**Sent:** Wednesday, March 22, 2006 7:02 PM
**To:** Sheehy, Janice; Crim, Carol H; Burton, Craig (OS); Boyer, David
**Subject:** Courtesy meeting AvE---FDA Nomination w/Enzi;Clinton;Murray

When: Tuesday, March 28, 2006 4:30 PM-5:30 PM (GMT-05:00) Eastern Time (US & Canada).
Where: SR-379A

*~*~*~*~*~*~*~*~*

Andrew Eschenbauch

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Friday, March 10, 2006 2:54 PM
**To:** Crim, Carol H
**Subject:** RE: Rescheduling of meeting between Senators Enzi, Clinton and Mu rray and Dr. Andrew von Eschenbach

We are confirmed for March 28th at 4:30 PM same location Russell Senate Office Building Room 379-A.

**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Friday, March 10, 2006 11:12 AM
**To:** Weinstein, Alana (Enzi)
**Subject:** RE: Rescheduling of meeting between Senators Enzi, Clinton and Mu rray and Dr. Andrew von Eschenbach
**Importance:** High

Alana,

Thursday, March 30, is a potential hearing date for us. Maybe morning, maybe afternoon, maybe not until the following week.

That said, I think we'd be safe in offering up some time late afternoon - 4 or after. What I truly don't want to happen is we set on a time and then have to change it.

I will certainly look at the week of April 3, if you think it best.

Thanks,

Carol

1

-----Original Message-----
**From:** Weinstein, Alana (Enzi) [mailto:Alana_Weinstein@enzi.senate.gov]
**Sent:** Friday, March 10, 2006 10:41 AM
**To:** Crim, Carol H
**Subject:** RE: Rescheduling of meeting between Senators Enzi, Clinton and Murray and Dr. Andrew von Eschenbach

Carol, is Thursday an optional day to schedule? We are going to need more dates. Too many conflicts.


**From:** Crim, Carol H [mailto:carol.crim@fda.hhs.gov]
**Sent:** Thursday, March 09, 2006 11:44 AM
**To:** Weinstein, Alana (Enzi)
**Subject:** Rescheduling of meeting between Senators Enzi, Clinton and Murray and Dr. Andrew von Eschenbach
**Importance:** High

Alana~

In reference to our phone conversation this morning concerning finding a mutually convenient date for the rescheduling of this meeting sometime during the week of March 27, 2006, I offer the following...

March 28 -- until 11 a.m. or after 2:30 p.m.
March 29 -- after 2:30 p.m.
March 31 -- after 1:00 p.m.

I may be able to offer some time on March 30 -- but it's totally dependent on outside factors over which I have no control. I will definitely let you know as soon as I know -- if we haven't rescheduled by then.

Again, let me say I truly appreciate your understanding and willingness to work with me to quickly establish a new meeting date.

Best regards,
Carol
301-827-3452

## DECLARATION OF INDYA MUNGO

I, Indya Mungo, do hereby declare under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Policy Analyst, Office of the Executive Secretariat, United States Food and Drug Administration ("FDA").

2. My responsibilities include, among other things, oversight of the requests made to FDA under the Freedom of Information Act ("FOIA") that are internally directed to Office of the Executive Secretariat.

3. By letter dated August 22, 2006, Christopher J. Farrell of Judicial Watch, Inc. submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Hillary Rodham Clinton, . . . [and/or] any agent and/or representative of Senator Hillary Rodham Clinton, and/or the Office of Senator Hillary Rodham Clinton regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'"

4. A copy of the Judicial Watch request was sent to FDA's Office of the Executive Secretariat. The responsibilities of the Office of the Executive Secretariat include providing correspondence control for the Commissioner, including the development and operation of tracking systems to identify and resolve early warnings and bottleneck problems with executive correspondence; and receiving and responding to incoming correspondence directed to the offices of the Commissioner.

5. I conducted a search of the Office of the Executive Secretariat's Agency Information Management System (AIMS) records for responsive documents concerning communications or correspondence between FDA and Senator Clinton or her agents or representatives and Plan B.

6. I made all of the responsive documents available to the Office of Legislation, which coordinated the agency's response to the Judicial Watch request.

Executed on April 26, 2007.

Indya Mungo
Policy Analyst
United States Food and Drug Administration

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-561 (RCL) |
| | ) | |
| U.S. FOOD AND DRUG | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF INDYA MUNGO

I, Indya Mungo, do hereby declare under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Policy Analyst, Office of the Executive Secretariat, United States Food and Drug Administration ("FDA").

2. My responsibilities include, among other things, oversight of the requests made to FDA under the Freedom of Information Act ("FOIA") that are internally directed to Office of the Executive Secretariat.

3. By request submitted on April 20, 2007, Deronda Grothe of Judicial Watch, Inc. ("Judicial Watch") submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Patty Murray, . . . [and/or] any agent and/or representative of Senator Patty Murray, and/or the Office of Senator Patty Murray regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Murray Request.")

4.  By an additional request submitted on April 23, 2007, Deronda Grothe of Judicial Watch submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Michael Enzi, . . . [and/or] any agent and/or representative of Senator Michael Enzi, and/or the Office of Senator Michael Enzi regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Enzi Request.")

5.  A copy of the Murray Request and Enzi Request was sent to FDA's Office of the Executive Secretariat.  The responsibilities of the Office of the Executive Secretariat include providing correspondence control for the Commissioner, including the development and operation of tracking systems to identify and resolve early warnings and bottleneck problems with executive correspondence; and receiving and responding to incoming correspondence directed to the offices of the Commissioner.

6.  I conducted a search of the Office of the Executive Secretariat's Agency Information Management System (AIMS) records for responsive documents concerning communications or correspondence between FDA and Senators Murray and Enzi or their agents or representatives regarding Plan B.

7.  All of the responsive documents that I located were forwarded to FDA's Office of Legislation for production to Judicial Watch.

Executed on July 11, 2007.

Indya Mungo
Policy Analyst
United States Food and Drug Administration

2

## DECLARATION OF KAREN E. SCHIFTER

I, Karen E. Schifter, do hereby declare under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am an Associate Chief Counsel, Office of the General Counsel — Food and Drug Division (OGC/FDD), Department of Health and Human Services.

2. By letter dated August 22, 2006, Christopher J. Farrell of Judicial Watch, Inc. submitted to the United States Food and Drug Administration (FDA) a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Hillary Rodham Clinton, . . . [and/or] any agent and/or representative of Senator Hillary Rodham Clinton, and/or the Office of Senator Hillary Rodham Clinton regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'"

3. OGC/FDD has been involved in coordinating, since January 2005, the government's defense in litigation over Plan B, and I am the attorney within OGC/FDD assigned to that case. In the course of assembling the administrative record and responding to discovery in that case, OGC/FDD has collected over 10,000 pages of FDA documents on Plan B, including correspondence, memoranda, and emails (in addition to the more than 100,000 pages in comments to the FDA docket and submissions from the drug sponsor related to its drug application). Any document within OGC/FDD that would be responsive to the Judicial Watch request would be within this collection of Plan B litigation documents.

4. I am familiar with the documents that OGC/FDD has collected in the Plan B litigation.

After my receipt of a copy of the FOI request from Judicial Watch, I supervised a search for any

responsive documents concerning communications or correspondence between FDA and Senator

Clinton or her agents or representatives within this collection of Plan B documents.

5. I compared the documents that we located with the documents that were collected by

FDA's Office of Legislation (OL) and produced to OL all documents that were not exact

duplicates of the documents it had already found.

Executed on May _1_, 2007.

Karen E. Schifter
Associate Chief Counsel
United States Food and Drug Administration

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JUDICIAL WATCH, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 07-561 (RCL) |
| | ) |
| U.S. FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF KAREN E. SCHIFTER

I, Karen E. Schifter, do hereby declare under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am an Associate Chief Counsel, Office of the General Counsel — Food and Drug Division (OGC/FDD), Department of Health and Human Services.

2. By request received on April 20, 2007, Deronda Grothe of Judicial Watch, Inc. ("Judicial Watch") submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Patty Murray[,] . . . [and/or] any agent and/or representative of Senator Patty Murray[,] and/or the Office of Senator Patty Murray regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Murray Request.")

3. By an additional request received on April 23, 2007, Ms. Grothe submitted, again on behalf of Judicial Watch, a request to FDA under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Michael Enzi[,] . . . [and/or] any agent

and/or representative of Senator Michael Enzi[,] and/or the Office of Senator Michael Enzi regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'" ("Enzi Request.")

    4. OGC/FDD has been involved in coordinating, since January 2005, the government's defense in litigation challenging FDA decision-making on Plan B, and I am the attorney within OGC/FDD assigned to those cases. In the course of assembling the administrative record and responding to discovery in that litigation, OGC/FDD has collected over 10,000 pages of FDA documents on Plan B, including correspondence, memoranda, and emails (in addition to the more than 100,000 pages in comments to the FDA docket and submissions from the drug sponsor related to its drug application). Any document within OGC/FDD that would be responsive to the Murray and Enzi Requests would be within this collection of Plan B litigation documents.

    5. I am familiar with the documents that OGC/FDD has collected in the Plan B litigation. After my receipt of copies of the Murray and Enzi Requests, I supervised a search for any responsive documents concerning communications or correspondence between FDA and Senators Murray or Enzi (or their agents or representatives) within this collection of Plan B documents.

    6. All of the responsive documents that I located were forwarded to FDA's Office of Legislation for production to Judicial Watch.

Executed on July 12, 2007.

Karen E. Schifter
Associate Chief Counsel
United States Food and Drug Administration

## DECLARATION OF CAROL H. CRIM

I, Carol H. Crim, do hereby declare under penalties of perjury, pursuant to 28 U.S.C.
§ 1746, that the following is true and correct to the best of my knowledge, information, and
belief:

1. I am a Special Assistant to the Commissioner, Immediate Office of the Office of the
Commissioner ("Immediate Office), United States Food and Drug Administration ("FDA").

2. My responsibilities include, among other things, oversight of the requests made to
FDA under the Freedom of Information Act ("FOIA") that are internally directed to the
Immediate Office.

3. By letter dated August 22, 2006, Christopher J. Farrell of Judicial Watch, Inc.
submitted to FDA a request under FOIA for "any and/or all communication and/or
correspondence between the FDA and Senator Hillary Rodham Clinton, . . . [and/or] any agent
and/or representative of Senator Hillary Rodham Clinton, and/or the Office of Senator Hillary
Rodham Clinton regarding '.75 levonorgestrel' also sold under the trade name 'Plan B.'"

4. The Judicial Watch request was conveyed to the Immediate Office, which has the
Commissioner's calendar records. I am familiar with those records, and I conducted a search for
any responsive records pertaining to communications or correspondence between FDA and
Senator Clinton or her agents or representatives regarding Plan B. I also conducted a search of
the Commissioner's meeting materials for responsive documents. I produced responsive records
reflecting the dates of meetings between the Commissioner and Senator Clinton to the Office of

Legislation, which coordinated the agency's response to the Judicial Watch request.

5. The meetings referenced by the calendar records occurred on Capital Hill, and there are no FDA minutes or notes of what transpired in those meetings.

Executed on May ∠, 2007.

*Carol H. Crim*

Carol H. Crim
Special Assistant to the Commissioner
United States Food and Drug Administration

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-561 (RCL) |
| | ) | |
| U.S. FOOD AND DRUG | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF KELLY PALMER

I, Kelly Palmer, do hereby declare under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am Executive Assistant, Immediate Office of the Office of the Commissioner ("Immediate Office"), United States Food and Drug Administration ("FDA").

2. My responsibilities include, among other things, responding to requests made to FDA under the Freedom of Information Act ("FOIA") that are internally directed to the Immediate Office.

3. By request submitted on April 20, 2007, Deronda Grothe of Judicial Watch, Inc. ("Judicial Watch") submitted to FDA a request under the FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Patty Murray, . . . [and/or] any agent and/or representative of Senator Patty Murray, and/or the Office of Senator Patty

Murray regarding '.75 levonorgestrel' also sold under the trade name 'Plan B'" ("the Murray Request").

4. By an additional request submitted on April 23, 2007, Deronda Grothe of Judicial Watch submitted to FDA a request under FOIA for "any and/or all communication and/or correspondence between the FDA and Senator Michael Enzi, . . . [and/or] any agent or representative of Senator Michael Enzi, and/or the Office of Senator Michael Enzi regarding '.75 levonorgestrel' also sold under the trade name 'Plan B'" ("the Enzi Request").

5. The Judicial Watch requests were conveyed to the Immediate Office, which has the Commissioner's calendar records and meeting materials. Carol H. Crim is the individual who is most familiar with these documents, but she is currently on extended medical leave and unavailable to respond to the Murray and Enzi requests. I conducted a search for communications and/or correspondence between the FDA and Senators Murray and Enzi relating to Plan B in the Commissioner's calendar records and meeting materials. All of the responsive documents that I located were forwarded to FDA's Office of Legislation for production to Judicial Watch.

6. The meetings referenced by the calendar records occurred on Capital Hill, and there are no FDA minutes or notes of what transpired in those meetings.

Executed on July 11, 2007.

*Kelly Palmer*

Kelly Palmer
Executive Assistant
United States Food and Drug Administration

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ——————————————— ) | | |
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.1:07CV00561(RCL) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOOD AND DRUG | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— ) | | |

## ORDER

Upon consideration of Defendant's Motion to Dismiss Or, In the Alternative, for Summary Judgment, it is this _____ day of _____, 2007:

_____   ORDERED that Defendant's Motion to Dismiss Or, In the Alternative, for Summary Judgment be and is hereby GRANTED.

_____   ORDERED that Plaintiff's complaint be and is hereby DISMISSED

_____   ORDERED that summary judgment be and is hereby entered in favor of Defendant.

SO ORDERED.

_____
United States District Judge