## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-00561 (RCL) |
| | ) | |
| U.S. FOOD AND DRUG | ) | |
| ADMINISTRATION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiff, Judicial Watch, Inc. ("Judicial Watch"), by counsel and pursuant to Rule 56(f)

of the Federal Rules of Civil Procedure, respectfully submits this opposition to Defendant Food

and Drug Administration's ("FDA") motion to dismiss or, in the alternative, for summary

judgment.  As grounds therefor, Judicial Watch states as follows:

## MEMORANDUM OF LAW

I.  **Introduction.**

"Ours is a government of laws, laws duly promulgated and laws duly observed.  No one is

above the law: not the executive, not the Congress, and not the judiciary.  One of our laws is the

Freedom of Information Act (FOIA).  That law, no less than any other, must be duly observed."

*American Civil Liberties Union v. Dep't of Defense*, 339 F. Supp. 2d 501, 502 (S.D.N.Y. 2004)

(internal citations omitted).  This statement is one regarding which the FDA needs reminding.

Inexplicably, after not one, but three instances of non-compliance, the FDA now seeks dismissal

or, in the alternative, summary judgment.

The FDA's non-compliance is replete throughout this case; indeed, it is the reason for this

case. When served with a FOIA request on August 22, 2006, the FDA did no more than acknowledge its receipt. Only after the FDA was served with a lawsuit after its near-seven months of silence, did the FDA produce records responsive to Judicial Watch's August 26, 2006 request. Similarly, when served with two related FOIA requests in mid-April 2007, the FDA did no more than acknowledge receipt of the requests. It was only after the Court permitted Judicial Watch to amend its complaint to include these two additional claims of non-compliance that the FDA produced records responsive to Judicial Watch's April 2007 requests.

Even with the productions, the FDA is still not complying with its FOIA obligations. Namely, the searches performed by the FDA were not reasonable. As evidence of this, are numerous demonstrated examples of missing information as well as the FDA's insufficiently detailed declarations. Despite the FDA's oleaginous assertions to the contrary, genuine issues of material fact do remain and summary judgment should not be granted.

## II.    **Argument**.

### A.    **Summary Judgment Standard**.

In FOIA litigation, as in all litigation, summary judgment is appropriate only when the pleadings and declarations demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed.R.Civ.P. 56(c). In FOIA cases, the agency decisions to "withhold or disclose information under FOIA are reviewed *de novo* by this court." *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 256 (D.D.C. 2004). In reviewing a motion for summary judgment under FOIA, the court must view the facts in the light most favorable to the requestor. *Weisberg v. United States Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

2

For an agency to prevail, it must "prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978).

Summary judgment is not appropriate in this case because a genuine issue of material fact exists as to the adequacy of the FDA's searches.

**B.     The FDA Failed to Conduct a Reasonable Search.**

FOIA mandates that government agencies make "reasonable efforts to search" for records responsive to a FOIA request. 5 U.S.C. § 552(a)(2)(E)(ii)(C). The law of this Circuit regarding the reasonableness of agency FOIA searches is clear. In responding to a FOIA request, an agency is required to show that it made "a good faith effort to conduct a search for the requested records, using methods that can be reasonably expected to produce the information requested." *Nation Magazine v. United States Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Oglesby v. United States Dept. of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). An agency is not required to search every record system, but it "cannot limit its search to only one record system if there are others likely to turn up the information requested." *Campbell v. United States Dept. of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998); *Oglesby*, 920 F.2d at 68.

The burden of persuasion as to the reasonableness of a search falls on the agency. *McGhee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983). Any affidavit(s) submitted by the agency describing its search for documents must be "relatively detailed and non-conclusory, and . . . submitted in good faith." *Safecard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). At the very least, the affidavit must denote which files the agency searched, and must explain in a systematic

way how the agency's documents were located in order to enable the Plaintiff to challenge the

procedures utilized during the search. *Oglesby*, 920 F.2d at 68. Additionally, if the

reasonableness of the search is challenged, as it is in this case, the agency must "demonstrate

'beyond a material doubt' that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540,

542 (D.C. Cir. 1990) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir.

1983)).

      **1.**    **Missing Records Demonstrate That the FDA Did Not Conduct a Reasonable Search.**

      Agencies are required to make "more than perfunctory searches and, indeed, to follow

through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast*

*Gaurd*, 180 F.3d 321, 325 (D.C. Cir. 1999). This requirement is fulfilled only if the agency can

"demonstrate beyond a material doubt that its search was 'reasonably calculated to uncover all

relevant documents." *Id.* (quoting *Truitt*, 897 F.2d at 542). The FDA has failed to demonstrate

that it conducted reasonable searches for records responsive to Judicial Watch's requests.

Several examples of missing information highlight this point.

      First, in the Murray production, the FDA included a copy of a portion of a U.S. House of

Representatives Subcommittee hearing transcript. *See* Exhibit 1 attached hereto. In response to

a question posed by Congresswoman Rosa DeLauro concerning meetings with FDA officials

regarding Barr Laboratories application for Plan B over-the-counter status, the response included

reference to a briefing given by Dr. Crawford and Dr. Galson to Senators Murray, Clinton, and

Kennedy on April 6, 2005. *Id.* Missing from both the Clinton and Murray productions is the

briefing material used for that meeting. It is simply unreasonable to think that two medical

doctors, one the acting director of the FDA's Center For Drug Evaluation and Research at the time, would brief three sitting U.S. Senators and not rely on any notes or written information.

Second, all three productions include only the Senators' "Questions for the Record" for Dr. Andrew C. Von Eschenbach, rather than any records of Dr. Von Eschenbach's nomination.[1] Dr. Von Eschenbach is the current FDA Commissioner and his role in obtaining over-the-counter status for Plan B was the subject of much consternation from both sides of the debate, including the very public hold Senators Clinton and Murray placed on Dr. Von Eschenbach's nomination. Surely, the FDA res records regarding Dr. Von Eschenbach's nomination. In fact, in an August 7, 2006 statement and press release, Senator Clinton stated that she questioned Dr. Von Eschenbach about recess appointments. *See* Exhibit 2, attached hereto. Senator Clinton's "Questions of Record" contain no such question. *See* Exhibit 3, attached hereto.

Third, Judicial Watch maintains that it is highly unlikely that the FDA has *no* records of any kind regarding the hold Senators Clinton and Murray placed on Dr. Von Eschenbach's nomination. Senators Clinton and Murray were very public about placing the hold on Dr. Von Eschenbach's nomination, and all three Senators arranged a meeting with him. The assertion that no correspondence or records resulted from either the meeting, or the hold, is risible.

### 2.    Inadequately Detailed Declarations Fail to Support the FDA's Search.

To demonstrate the reasonableness of its search, the agency's affidavits must be "relatively detailed, nonconclusory, and submitted in good faith." *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979). Because of the "peculiarities inherent in

---

[1]     All three productions included records on the March 17, 2005 nomination of Dr. Lester Crawford.

FOIA litigation, with the responding agencies often in sole possession of requested records and with information searches conducted only by agency personnel," courts have relied on the agency affidavits "to determine whether the statutory obligations of FOIA have been met." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982). However, reliance on agency affidavits is not blind and does not require courts to "accept glib government assertions of complete disclosure or retrieval." *Id.* Additionally, the D.C. Circuit had held that instances of countervailing evidence, inconsistency of proof, and "positive indications of overlooked materials" can rebut agency affidavits, as well as evidence of bad faith. *Id.* at 127-28 (internal citations omitted).

The declarations submitted by the FDA are not sufficiently detailed, particularly in light of the above-mentioned examples of countervailing evidence. None of the declarations submitted describe the search terms or the type of search performed. Rather, each declaration simply asserts that the declarant "conducted a search" or "supervised a search." *See* May 2, 2007 Declaration of Lisa C. Granger at ¶ 10 (no search terms or detail of system); June 12, 2007 Declaration of Lisa M. Granger at ¶ 11 (no search terms or detail of system); April 26, 2007 Declaration of Indya Mungo at ¶ 5 (no search terms); July 11, 2007 Declaration of Indya Mugno at ¶ 6 (no search terms); May 1, 2007 Declaration of Karen E. Schifter at ¶ 4 (no search terms or system); July 12, 2007 Declaration of Karen E. Schifter at ¶ 5 (no search terms or system); Declaration of Carol H. Crim at ¶ 4 (no search terms or system); and Declaration of Kelly Palmer at ¶ 5 (no search terms or system).

Ms. Granger's Declarations state that she searched the Office of Legislation "tracking system," but neither declaration described what the "OL tracking system" is or how it operates. *See* May 2, 2007 Declaration of Lisa C. Granger at ¶ 10; June 12, 2007 Declaration of Lisa M.

6

Granger at ¶ 11; April 26, 2007 Declaration of Indya Mungo at ¶ 5; July 11, 2007 Declaration of

Indya Mugno at ¶ 6.  Similarly, Mr. Mungo's declarations state that she searched the "Office of

Secretariat's Agency Information Management System ('AIMS')" but never describes the AIMS

system or how it operates.  The other declarations fail to identify in any way, what system was

used in the searches.

Also missing from the FDA's affidavits is any description of how the search was actually

conducted, including what each declarant found as a result of the search.  The FDA does make

clear that Ms. Granger coordinates the production, but none of the declaration state what records

were actually found as a result of their nondescript search.[2]  *See* April 26, 2007 Declaration of

Indya Mungo at ¶ 5 (made the responsive documents available to the Office of Legislation); July

11, 2007 Declaration of Indya Mugno at ¶ 7 (forwarded responsive documents to the Office of

Legislation); May 1, 2007 Declaration of Karen E. Schifter at ¶ 5 (produced non-duplicative

documents to the Office of Legislation); July 12, 2007 Declaration of Karen E. Schifter at ¶ 6

(produced non-duplicative documents to the Office of Legislation); Declaration of Carol H. Crim

at ¶ 4 (produced responsive records); and Declaration of Kelly Palmer at ¶ 5 (forwarded

responsive documents to the Office of Legislation).

The D.C. Circuit held that an affidavit that does not show, with reasonable detail, that the

search method "was reasonably calculated to uncover all relevant documents" does not satisfy the

FOIA burden.  *Oglesby*, 920 F.2d at 68.  Similarly, an affidavit that fails to "identify the terms

---

[2]     Ms. Crim does state that the records she produced reflected the "dates of meetings between the Commissioner and Senator Clinton."  Crim Decl. at ¶ 4.  Judicial Watch assumes these records consist of the emails and reminders of appointments.  However, a sufficiently detailed declaration should not require assumptions on the part of the Court or the requestor.

searched or explain how the search was conducted" does not satisfy the FOIA burden. *Id.* The

FDA's declarations have clearly not met FOIA's burden for sufficiently detailed. As the D.C.

Circuit held:

> If the agency can lightly void its responsibilities by laxity in identification or
> retrieval of desired materials, the majestic goals of the [FOIA] Act will soon pass
> beyond reach. And if, in the fact of well-defined requests and positive indications
> of overlooked materials, an agency can so easily avoid adversary scrutiny of its
> search techniques, the Act will inevitably become nugatory.

*Founding Church*, 610 F.2d at 837.

**III.    Conclusion.**

For the foregoing reasons, the FDA's motion to dismiss or, in the alternative, for

summary judgment should be denied.


July 30, 2007                                      Respectfully submitted,

                                                   JUDICIAL WATCH, INC.


                                                    /s/ Meredith L. Di Liberto
                                                   D.C. Bar No. 487733
                                                   Paul J. Orfanedes
                                                   D.C. Bar No. 429716
                                                   Suite 500
                                                   501 School Street, S.W.
                                                   Washington, DC 20024
                                                   (202) 646-5172

                                                   *Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-00561 (RCL) |
| | ) | |
| U.S. FOOD AND DRUG | ) | |
| ADMINISTRATION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel and pursuant to LcvR 56.1,

submits the following response to Defendant U.S. Food and Drug Administration's ("FDA")

Statement of Material Facts as to Which There is No Genuine Issue:

1. Undisputed.

2. Undisputed.

3. Undisputed that the FDA sent Judicial Watch records responsive to the Clinton

FOIA request. Deny any implication that it was a full production.

4. Undisputed.

5. Undisputed.

6. Dispute that the FDA has produced all records responsive to the Enzi and Murray

FOIA requests.

7. Dispute as to the thoroughness of the searches performed by the FDA.

8. Dispute.

1

9.      Dispute.

10.      Dispute.

Judicial Watch respectfully submits the following statement of material facts as to which

there is no genuine issue:

1.      The FDA failed to comply with the statutory deadlines imposed by FOIA on each

of the FOIA requests sent by Judicial Watch.

2.      The FDA waited almost eight months to produce records responsive to the

Clinton FOIA request.

3.      Despite ongoing litigation, the FDA waited almost three months to produce

records responsive to the Enzi and Murray FOIA requests.

July 30, 2007                                          Respectfully submitted,

                                                       JUDICIAL WATCH, INC.


                                                        /s/ Meredith L. Di Liberto
                                                       D.C. Bar No. 487733
                                                       Paul J. Orfanedes
                                                       D.C. Bar No. 429716
                                                       Suite 500
                                                       501 School Street, S.W.
                                                       Washington, DC 20024
                                                       (202) 646-5172

                                                       *Attorneys for Plaintiff*

EXHIBIT 1

# AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS FOR 2006

## HEARINGS

BEFORE A

### SUBCOMMITTEE OF THE

## COMMITTEE ON APPROPRIATIONS

## HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

FIRST SESSION

SUBCOMMITTEE ON AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES

**HENRY BONILLA, Texas,** *Chairman*

JACK KINGSTON, Georgia
TOM LATHAM, Iowa
JO ANN EMERSON, Missouri
VIRGIL H. GOODE, JR., Virginia
RAY LAHOOD, Illinois
JOHN T. DOOLITTLE, California
RODNEY ALEXANDER, Louisiana

ROSA L. DeLAURO, Connecticut
MAURICE D. HINCHEY, New York
SAM FARR, California
ALLEN BOYD, Florida
MARCY KAPTUR, Ohio

NOTE: Under Committee Rules, Mr. Lewis, as Chairman of the Full Committee, and Mr. Obey, as Ranking Minority Member of the Full Committee, are authorized to sit as Members of all Subcommittees.

MARTIN P. DELGADO, MAUREEN HOLOHAN, LESLIE BARRACK, and JAMIE SWAFFORD,
*Staff Assistants*

### PART 7

| | Page |
|---|---|
| **Food and Drug Administration** | 1 |
| **Farm Credit Administration** | 809 |
| **Commodity Futures Trading Commission** | 857 |



769

Ms. DeLauro:  How much, in total, has FDA awarded in bonuses from January 1, 2003 to the date of receipt of this question?

Response:  From January 1, 2003 to April 16, 2005, the FDA awarded $19,674,855 in bonuses to Civilian employees.

Ms. DeLauro:  Please list any meetings attended by Dr. Steven Galson or any other official at or above his level in the agency (or any conference calls involving any of these officials) with any person other than an FDA employee or an employees of Barr Laboratories, at which the application by Barr for OTC status for Plan B was discuss: Please give dates and a full list of participants at such meetings.

Response:  Dr. Galson met with GAO representatives on February 23, 2005 to discuss the OTC status for Plan B.  The participants from GAO were Marty Gahart, Robert Copeland, Deborah Miller, and Gay Hee Lee.

Dr. Crawford and Dr. Galson briefed Senator Murray, Senator Clinton, and Sena Kennedy on Plan B on April 6, 2005.

Ms. DeLauro:  Page 436 of the 2006 budget shows that FDA contributed $1,002,895 in 2004 for activities of the Office of Global Health Affairs at HHS. Please respond to the following questions: what the basis is for this contribution (e.g., MOU) and provide a copy of any document describing the basis for the contribution;
by what method the amount of the FDA contribution is determined;
what the payments were/are/will be for FY 2002, 2003, 2005, and 2006; and
whether the FDA funding supports specific activities of that office (and if so, what they are) or whether the funds support only general activities.

If you need to consult with HHS to answer any of the questions, please do so and please provide the information you receive. Please **do not** respond that the question needs to be redirected to HHS.

Response:  A reimbursable agreement provided by the Office of Global Affairs is the basis for our contribution.
The agreement had the FDA costs listed, but there was no backup methodology to show the basis for the specific cost.

Payments were $1,036,604 in FY 2002, and $973,685 in FY 2003.  The current agreement for FY 2005 is $1,050,150.  The FY 05/06 estimates for the Contract is being negotiated.

There are no specific activities mentioned, but rather the agreement states: "... for services in support of FY 2004 bilateral and multilateral activities..."

Ms. DeLauro:  The 2006 budget does not include a request for funds to fully fund the required increases in pay costs, leading the agency to estimate it would have 251 fewer non-user-fee-funded FTEs in FY 2006 than in FY 2005, as shown on page 370 of the budget document.  What increase in funding would be required to assure that budget authority funded FTEs in 2006 remained at the 2005 level?

Response:  Costs of the pay increase will be addressed within the FDA total.  FDA will work to ensure that FTE levels in FY 2006 will be sufficient to carry out the agencies mission and protect the public health.

EXHIBIT 2

# NEW YORK
# Senator Hillary Rodham Clinton
## STATEMENTS & RELEASES

Home | News | Contact | About | Services | Issues | New York

August 7, 2006

## Senator Clinton, Healthcare Advocates Join in Calling for a Decision on Plan B

*Senator Clinton, representatives from NARAL, Planned Parenthood, Family Planning Advocates and the healthcare community call for politics to be removed from the approval process*
*Senator calls on Bush Administration to reject a recess appointment for FDA Acting Commissioner von Eschenbach*

**New York, NY** - Senator Hillary Rodham Clinton today joined with healthcare advocates and representatives from Planned Parenthood, NARAL Pro-Choice New York and Family Planning Advocates of New York State at a press conference to call on Acting FDA Commissioner Andrew von Eschenbach to stop the continual delaying tactics and make a decision on Plan B.



"We're within months of the three year mark since the FDA's own expert staff and advisory panels voted overwhelmingly to make this emergency birth control available without a prescription, with no age restriction. During this time we have seen two successive FDA commissioners block Plan B from being sold over the counter, overruling the FDA's medical experts, advisors, and the recommendations of over 70 organizations, including the American Medical Association and the American Academy of Pediatrics," Senator Clinton said "It is outrageous that under this Administration, an agency entrusted with making unbiased decisions based on science has abused its authority and allowed ideology to govern its decision-making."

Senator Clinton, along with her colleague Senator Patty Murray, has long been fighting for a decision on Plan B's application. Last week the Senators underscored that they will maintain their hold on von Eschenbach's nomination for FDA

Commissioner until a decision is made.

"Our citizens look to the FDA to give its Good Housekeeping seal of approval. They need to trust that the Agency is making decisions based solely on science. I'm afraid that the gold standard which FDA has held for so long is in jeopardy. At a time when too many decisions in Washington are being governed by politics and not the facts, we need to make our voices heard that this delay is unacceptable and the FDA owes the American people a decision," Senator Clinton said.

At the press conference, at the Helen B. Atkinson Health Center, Senator Clinton, who was also joined by Assemblyman Keith Wright, called on the Administration to reject a recess appointment for von Eschenbach. "My colleague Patty Murray and I have placed a hold on von Eschenbach's nomination. I call on the President to respect the role of the Senate and not bypass Congress by appointing von Eschenbach during the recess," Senator Clinton said.

"Planned Parenthood calls on the FDA to quit stalling and live up to its mission of protecting the public's health and well-being. There is no scientific basis for denying EC over-the-counter availability. For too long, the FDA has put ideology above science and the health of women and families," said Joan Malin, President and CEO, Planned Parenthood of New York City.

"The 62 million American women of child bearing age have been awaiting action from the FDA for three long years now. In that time, politics have been allowed to trump science and the integrity of the FDA's decision making process has become suspect. If the FDA is to regain the public trust, they must keep their promise and issue a decision - one that is based on their own medical findings. They must move to make emergency contraception over the counter. We can wait no longer," said Mary Alice Carr, Vice President for Communications, NARAL Pro-Choice New York.

"We thank Senator Clinton for standing up for women's health and pushing the FDA to make a decision on this critical issue," said Catherine Abate, chair of the board of Family Planning Advocates of New York State and president and CEO of Community Healthcare Network. "The FDA's own advisory committees recommended making Plan B available over the counter, yet the scientific evidence continues to be ignored with each new delay tactic the Agency introduces."

At his Senate confirmation hearing last week, Senator Clinton pressed acting FDA Commissioner Andrew von Eschenbach on the continuing unusual handling of the pending application to sell Plan B over the counter. After years of delay and nearly a year of silence on the Plan B application, FDA on the eve of Dr. von Eschenbach's confirmation hearing sent a letter to the manufacturer of Plan B asking for a meeting to discuss the status of the application. Senator Clinton, along with Senator Patty Murray, placed a hold on Dr. von Eschenbach's nomination and made clear they would not lift the hold until the FDA makes a decision on Plan B, yes or no. Senator Clinton recently made clear that this hold will stay in place until the FDA makes a decision.

At the hearing last week, Senator Clinton questioned Dr. von Eschenbach on whether or not he would accept a recess appointment before a decision is made on Plan B. Dr. von Eschenbach indicated that he wanted the Senate Committee to consider his nomination on the merits. Senator Clinton also pressed Dr. von Eschenbach on a letter released by the FDA that suggested that, if the FDA approves Plan B for over the counter sale to those 18 and over, the FDA would hold the maker of Plan B to an unusual standard, requiring the producer – not retailers selling Plan B – to police and enforce age restrictions on the sale of Plan B. Senator Clinton secured a commitment from Dr. von Eschenbach that the FDA would not hold the producer of Plan B to unprecedented standards to enforce limitations on its sale beyond what has been expected of any other company.

### ###

clinton.senate.gov

EXHIBIT 3

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

### Senator Clinton

**Question 1: Dr. von Eschenbach, as you know, the FDA has had this application for over three years- since April 21, 2003- and we appear to be no closer to having a resolution than we were the day it was filed. We had a promise from Secretary Leavitt that we would have a decision on this application by September 1st and today, almost an entire year later, we are still waiting. We have been clear all along that we are not asking for a specific outcome – we are simply asking for a decision. When are we going to have a decision from the FDA?**

Answer: On August 24, 2006, FDA approved the amended sNDA from Barr Laboratories allowing OTC sale of Plan B® to adults 18 and older.  Plan B will be available to patients 17 and younger by prescription.

**Question 2: In your letter to Mr. Carrado, you also discuss the CARE$^{SM}$ Program, a program proposed by Duramed outlining the marketing, education, distribution, and monitoring for the OTC version of Plan B. Specifically, you express the FDA's strong interest in Duramed's enforcement strategy if a pharmacy fails to comply with regulations to keep Plan B behind the counter and to require that patients show photo identification to obtain the drug. Is it considered standard procedure to hold pharmaceutical companies liable for the actions of independent pharmacies?**

Answer: The approval of Plan B does not hold Duramed liable for the actions of independent pharmacies. Duramed provided revisions to its CARE$^{SM}$ program that satisfied FDA that it would take steps to monitor the implementation of the program and report to FDA periodically regarding the results of its monitoring program.  The program also provides that the sponsor will report repeat violators of the age restriction to the appropriate State Boards of Pharmacy.  FDA intends to monitor the program's effectiveness so that we can discuss with the sponsor further modifications if necessary to prevent inappropriate use of Plan B.

**Later on in your letter, you write "If after our discussions we conclude that the CARE$^{SM}$ Program isn't sufficiently rigorous to prevent the OTC version of Plan B® from being used by young girls who can't safely use the product without the supervision of a practitioner licensed by law to administer the drug, Plan B® will remain Rx-only for women of all ages."**

**What, in your opinion, constitutes a "sufficiently rigorous" program? How much evidence would you need to support a decision to deny Plan B's OTC application entirely- considering the overwhelming scientific evidence demonstrating its safety and efficacy, in addition to over seventy from medical major medical organizations?**

Duramed provided revisions to its CARE$^{SM}$ program that were considered to be  "sufficiently rigorous" by the Agency.  Duramed satisfied FDA that it would take steps to monitor the implementation of the program and report to FDA periodically regarding the results of its monitoring program.  FDA intends to monitor the program's effectiveness so that we can discuss with the sponsor further modifications if necessary to prevent inappropriate use of Plan B.

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

Question 3:  A consequence of the FDA's refusal to make a decision on Plan B has been a deterioration of trust in the integrity of this agency.  Last year, The New England Journal of Medicine published a damning op-ed titled "A Sad Day for Science at the FDA."  And the GAO report made clear that the FDA process and decision-making process was highly atypical and suspect.  Out of 67 over-the-counter applications made in the past decade, this was the only one that was not approved after the advisory committee recommended approval and the only one in which the action letter was signed by the Director of the Center for Drug Evaluation and Research.

The Journal article labels the Plan B controversy as "a mockery of the process of evaluating scientific evidence," and concludes with a haunting question, "Will we ever again be able to believe in the FDA's independence?" Given the recent actions of the FDA leadership, I fear I cannot dismiss this question with confidence.

An editorial in the New York Times from March 25th of this year said the following of the FDA's non-decision on Plan B :
"We don't generally approve of holding nominations hostage to other political objectives. But Senators Hillary Clinton and Patty Murray surely have good cause to block a vote on the nomination of Dr. Andrew von Eschenbach to become commissioner of the Food and Drug Administration until the agency makes a final decision on the morning-after pill. There is no excuse for the administration's endless obfuscation and delays on making the pill available without a prescription when the overwhelming bulk of expert opinion says it is safe to do so."

Dr. von Eschenbach, the bottom line here is that the public health community and much of the general public has begun to question the allegiances of the FDA. For the sake of the agency's reputation and good standing in the public, which directly impacts its effectiveness. What can the FDA do and what can Members in this chamber do to further expedite this already long-overdue decision-making process?

Answer:  On August 24, 2006, FDA approved the amended sNDA from Barr Laboratories allowing OTC sale of Plan B® to adults 18 and older.  Plan B will be available to women 17 and younger by prescription.

Question 4:  We know that the FDA's advisory panel voted overwhelmingly (23 to 4) that this drug should be available over the counter. We know that ACOG, the America Academy of Pediatrics, the American Medical Association and more than 70 other major medical organizations have recommended that the application should be approved. And we know that the New England Journal of Medicine believes what has taken place flies in the face of science.

When I questioned Mr. Crawford in March of 2005 regarding Plan B's application, he told this Committee and I quote: "I can assure you that this decision will not be based on politics, it will be based on science…I don't think it's going to be a long delay." It's been

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

almost a year and a half since Mr. Crawford made these claims and sadly we can see his promises have not been kept.

**What principles do you believe should guide the FDA when it makes decisions about what drugs may be available over the counter?**

Answer: The statutory standards established by Congress and the provisions of FDA's regulations guide the FDA when it makes decisions about what drugs may be available over the counter. FDA's regulations provide that FDA will approve a switch to OTC use when it finds that prescription dispensing is "not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and . . . the drug is safe and effective for use in self-medication as directed in proposed labeling.

Such switch applications generally include data from actual use and labeling comprehension studies to demonstrate that the product can be safely and effectively used without the supervision of a practitioner licensed by law to administer the drug. FDA may approve an NDA application only when, among other things, the investigations submitted in the application include adequate tests showing whether or not the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling and when there is sufficient information to determine from the application whether the drug is safe for use. FDA will apply these statutory standards to any switch application submitted to it.

**Under what circumstances do you believe it is appropriate for the FDA to override such strong scientific evidence in making such decisions? What more information does the FDA need to make a decision on Plan B?**

On August 24, 2006, FDA approved the amended sNDA from Barr Laboratories allowing OTC sale of Plan B® to adults 18 and older. Plan B will be available to patients 17 and younger by prescription.

**Question 5: Dr. von Eschenbach, I can't help but notice a gradual increase in the age deemed acceptable for appropriate use of Plan B. Allow me to describe the following timeline of this age discussion:**

**In July of 1999, the U.S. Food and Drug Administration approved Plan B, finding it safe and effective for women of all ages to use as a prescription product. On December 16, 2003, the FDA's independent panel of experts votes 23 to 4 to recommend Plan B be made available OTC, with no age restriction. The panel also voted unanimously that Plan B is safe for nonprescription use.**

**Despite these findings, on May 6, 2004, Dr. Steven Galson, Acting Director of the Center for Drug Evaluation and Research overrode FDA professional staff recommendations and issues a "not approvable" letter to Plan B's manufacturer, citing concerns about young teens using the drugs.**

Andrew C. Von Eschenbach, M.D. Confirmation
Questions for the Record

Two months later, [July 22, 2004] Barr Pharmaceuticals submitted a revised OTC proposal to FDA, which would make it available to women 16 and older without a prescription while requiring one for women 15 and under. Despite this response to their stated concerns, the FDA failed to make a decision within the deadline imposed under federal law governing performance standards.

In 2005, Mr. Crawford wrote a letter to a Mr. Joseph Carrado, Senior Director of Regulatory Affairs at Duramed Research, a subsidiary of Barr Pharmaceuticals. Within the text of his letter, Crawford explicitly states that the Center for Drug Evaluation and Research (CDER)'s findings "support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older."
This year, however, in a letter to Mr. Carrado, written just yesterday, you state that the FDA believes the "appropriate age for OTC access [for Plan B] is 18."

Dr. von Eschenbach, what prompted the addition of a year to the FDA's criteria for what constitutes the "appropriate age" for Plan B? Did new scientific research lead to your move from 17 to 18 years of age? If not, how do you explain your departure from Mr. Crawford's words just a year ago?

Answer: The Center for Drug Evaluation and Research (CDER) at FDA determined that the data submitted by the sponsor (Duramed or Barr) in its 2004 application supported OTC use for women 17 and older. In considering the difficulty of enforcing an age-based restriction on the availability of this oral hormonal contraceptive, however, I have concluded that 18 (rather than 17) is the more appropriate cutoff to best promote and protect the public health. The state-regulated pharmacies that will be dispensing Plan B® under Barr's voluntary Convenient Access, Responsible Education (CARE) program (as well as society as a whole) are more familiar with 18 as a cutoff age. I understand that in all 50 states, 18 is the age of majority (i.e., the legal delineation between minor and adult), and retail outlets, including pharmacies, are familiar with using 18 as the age of restriction for the sale of certain products. With regard to the sale of certain drug products, the legal age to purchase FDA-approved non-prescription nicotine replacement therapy products is 18. Moreover, I understand that as a matter of state law, many products routinely sold by pharmacies, e.g., tobacco products and non-prescription cough-cold products like pseudoephedrine are restricted to consumers 18 and older. The approach builds on well-established state and private sector infrastructures to restrict certain products to consumers 18 and older. This approach should, therefore, help ensure safe and effective use of Plan B.

**FDA Authority**

Question 6: Several questions have been raised as to whether the FDA has the legislative and regulatory authority it needs to carry out its mission of ensuring the safety of food and drugs used by American consumers. What additional authority would you identify as necessary to enable the FDA to ensure the safety and efficacy of the drugs, medical devices and foods manufactured and sold in our nation?

Answer: FDA is fully capable of carrying out its mission under its current statutory and regulatory authority.